# WILLIAM THOMAS STEWART *v.* STATE OF MARYLAND

[No. 172, Initial Term, 1967.]

*Decided May 19, 1967.*

The cause was argued before ANDERSON, MORTON, ORTH, and THOMPSON, JJ., and RUSSELL, J., Associate Judge of the Eighth Judicial Circuit, specially assigned.

*Livingston W. Yourtee* for appellant.

*Thomas A. Garland, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General,* and *Julian B. Stevens, Jr., State's Attorney for Anne Arundel County,* on the brief, for appellee.

ORTH, J., delivered the opinion of the Court.

Appellant was convicted on April 25, 1966 in the Circuit

Court for Anne Arundel County before Judge Matthew S. Evans, presiding without a jury, for illegal possession of a narcotic drug. He was sentenced to imprisonment for a term of five years.

The record discloses that on September 18, 1964 appellant visited Judith Ann Turner, who was confined in the Maryland Correctional Institution for Women. Appellant registered as William Turner, husband of the prisoner. During the visit they were seated at a small table, about three feet in diameter, in the visiting room, under the watchful eye of Mrs. Francis J. Melvin, assistant superintendent of the Institution, who was especially alert because she had received information that the prisoner had been getting narcotics from the appellant. Mrs. Melvin was seated about three feet from them. The prisoner was facing Mrs. Melvin and the appellant was sitting with his back partly toward Mrs. Melvin. The visit lasted thirty minutes, during which period, two of the three men with whom the appellant had driven to the Institution came into the room and got a drink of water. Although they walked back of the chair in which the prisoner was seated, they did not touch her. At the end of the visit, the prisoner stood up and came around to appellant and they kissed. Mrs. Melvin also stood up to get a better view. The kiss lasted about two minutes and Mrs. Melvin observed the appellant's jaw working "like you would have your tongue in your jaw and actually trying to dislodge something." The prisoner attempted to explain this by saying she kissed the appellant by sticking her tongue in his mouth and this was the way she usually kissed everyone. The prisoner started to leave the room. Mrs. Melvin called to her that she wanted to see her and followed immediately behind the prisoner into an office. Mrs. Melvin asked the prisoner to open her mouth, assisting her by holding the prisoner's nose, and removed a package about the size of a half a dollar from her mouth. The prisoner bolted from the room, went out the side door and ran up the road. She was later apprehended about a quarter of a mile from the Institution. Mrs. Melvin went to the parking lot and noted the license number of the automobile in which the appellant had driven to the Institution. The police were notified and Mrs. Melvin gave Corporal Wilford H. Law-

rence, of the Maryland State Police, the package she had obtained from the prisoner's mouth, the description of the automobile and the occupants and the license number. Only the appellant visited the prisoner on the day these events occurred and the prisoner was the only inmate who had a visitor on that day.

The package contained five clear plastic type capsules, each of which contained a white powdery type substance. While still at the Institution, Corporal Lawrence made a field test on a small amount of the powder from one of the capsules and the test indicated the powder was a narcotic. He then had a "lookout" broadcast for appellant. Less than thirty minutes from the time the "lookout" was broadcast, the automobile was stopped at Fayette and Caroline Streets in Baltimore City. It was occupied by four men, one of whom was the owner and driver. Appellant was seated in the right rear. The car was taken to the Eastern District Police Station. When Corporal Lawrence arrived at the Station, the owner of the automobile had signed a waiver of search. The automobile was searched and a makeshift hypodermic needle and a burnt cap, used for heating narcotics, were found on the floor near the seat at the left rear. On the right front seat, a makeshift eyedropper and two handkerchiefs that appeared to have drops of blood on them were found. A handkerchief was recovered from the right rear floor and a shotgun from the trunk.

The contents of the capsules were tested by a chemist at the United States Customs laboratory and found to be heroin hydrochloride. Corporal Lawrence, a member of the police force for eight years and experienced in investigation of violation of narcotics laws, testified that instruments of the type of hypodermic needle were used by addicts to inject themselves with narcotic drugs. The capsules and contents and the hypodermic needle were admitted in evidence over objection.

Appellant's contentions on this appeal may be summarized as follows:

1) The narcotic drug and the hypodermic needle were improperly admitted in evidence.

2) The evidence was not sufficient to sustain the conviction.

Appellant's contention with respect to the narcotic drug is

that it was obtained from Judith Ann Turner by an unreasonable search and seizure and is therefore inadmissible against him. The short answer is that Maryland follows the majority view of the federal and state courts, requiring the objector to present to the court an alleged violation of his own constitutional rights as a prerequisite to his right to object to "tainted" evidence. In *McChan v. State,* 238 Md. 149 (1965), the Court of Appeals said, at page 158:

> "* * * the right of immunity from unreasonable search and seizure is personal and one who disclaims ownership or other possessory interest has no right to protest the legality of a search and seizure. *Carter v. State,* 236 Md. 450, 204 A. 2d 322 (1964)." See Lingner v. State, 199 Md. 503 (1952).

The record does not disclose that appellant, in the instant case, claimed ownership or a possessory interest in the heroin. But in any event, we do not find the search and seizure to be unlawful. Amendment IV of the Constitution of the United States and Article 26 of the Maryland Declaration of Rights do not prohibit a search and seizure; they only require that it must not be unreasonable. There are exceptions to the general rule that the search of a person without a warrant and the seizure of things which are evidence of the commission of a crime are unreasonable and therefore unlawful. The search of a person without a warrant incident to a lawful arrest is not unreasonable. A person may freely and voluntarily consent to a search of his property or person without a warrant. *McChan v. State,* supra, and cases cited. See *Vauss v. U. S.,* 370 F. 2d 25, D. C. (1966) in which it was held that the search of one found in an unconscious condition is both legally permissible and highly necessary and narcotics found by the search gave grounds for the arrest and were admissible in evidence. We feel that the search of inmates of a penal institution, which does not amount to harassment or oppression to the extent that it constitutes cruel or unusual punishment, is another exception to the general rule. In *McCloskey v. State,* 337 F. 2d 72 (1964), the Court said, at page 74:

"Imprisoned felons and inmates of such institutions as Patuxent cannot enjoy many of the liberties, the rights and the privileges of free men. They cannot go abroad or mount the housetops to speak. They are subjected to rigid physical limitations and to disciplinary controls which would find no shred of justification in any other context. Even the disciplinary powers of military authorities are not so absolute.

Because prison officials must be responsible for the security of the prison and the safety of its population, they must have a wide discretion in promulgating rules to govern the prison population and in imposing disciplinary sanctions for their violation. If a tractable inmate is subjected to cruel and unusual punishment or if his exercise of a constitutional right is denied without semblance of justification arising out of the necessity to preserve order and discipline within the prison, he may have a right of judicial review. In the great mass of instances, however, the necessity for effective disciplinary controls is so impelling that judicial review of them is highly impractical and wholly unwarranted. The remedy of the inmate is through administrative review, which ought to be available always."

In *Lanza v. New York*, 370 U. S. 139 (1962), the Supreme Court said:

"But to say that a public jail is the equivalent of a man's 'house' or that it is a place where he can claim constitutional immunity from search or seizure of his person, his papers, or his effects, is at best a novel argument. To be sure, the Court has been far from niggardly in construing the physical scope of Fourth Amendment protection. A business office is a protected area, and so may be a store. A hotel room, in the eyes of the Fourth Amendment, may become a person's 'house,' and so, of course, may an apartment. An automobile may not be unreasonably

searched. Neither may an occupied taxicab. Yet, without attempting either to define or to predict the ultimate scope of Fourth Amendment protection, it is obvious that a jail shares none of the attributes of privacy of a home, an automobile, an office, or a hotel room. In prison, official surveillance has traditionally been the order of the day."

The Court by implication approved a prison regulation reproduced in a footnote to the above quoted statement, as follows:

"All parts of the jail should be frequently searched for contraband. * * * Saws have been secreted in bananas, in the soles of shoes, under the peaks of caps, and drugs may be secreted in cap visors, under postage stamps on letters, in cigars and various other ways * * *. Cells should be systematically searched for materials which would serve as a weapon or medium of self destruction or escape. Razor blades are small and easily concealed."

It is clear that prison security necessitates extreme restrictions on access to and possession of personal property by inmates but we do not say that by reason of conviction and imprisonment a person is no longer entitled to his constitutional rights. A prisoner retains all rights of an ordinary citizen except those expressly or by necessary implication taken from him. We feel that the search of an inmate of a penal institution, if not expressly permitted by statute, is authorized by implication as reasonably necessary in the fulfillment of the custodian's duty to maintain prison security, to preserve order and discipline, to insure the safety of the prison population, and to see that the prisoners conduct themselves in a decent and orderly manner. See 41 *Am. Jur., Prisons and Prisoners*, V § 36-37. Thus such a search and seizure is not unreasonable and an inmate of a penal institution cannot claim constitutional immunity from search and seizure of his person by prison authorities. Therefore, contraband seized in such a search may not only be confiscated and used as the reason for disciplinary punishment by prison authorities, but, if otherwise admissible, is not ren-

dered inadmissible in a criminal prosecution by reason of the search. See *U. S. v. Miller*, 261 F. Supp. 442, Del. (1966) in which it was held that although the Fourth and Fifth Amendment rights to the federal constitution are afforded military personnel, when the military invokes the federal courts for criminal prosecutions, the fact that the defendant was a military man, arrested by military authorities, made reasonable a directive requiring that persons be "strip searched" for weapons prior to interrogation. Evidence found by such a search was admissible. It is also noted in the instant case that the assistant superintendent had received information that the appellant had been passing drugs to the prisoner and the conduct of the two was such that she had probable cause to believe the drugs were being passed in her presence and were then in the possession of the prisoner. We hold that the narcotic drugs were properly admitted in evidence.

Appellant's contention with respect to the hypodermic needle is that is was "incapable of affording a reasonable presumption or inference as to the principle fact in dispute". We do not agree. We find that the hypodermic needle and the testimony concerning the burnt cap, the handkerchiefs and the eye dropper were properly admitted in evidence. The admission in evidence of any fact collateral to the main issue is ordinarily within the discretion of the trial court and all reasonable presumptions necessary to uphold its rulings will be indulged. The real test of admissibility is the connection of the fact proved with the offense charged, as evidence which has a natural tendency to establish the fact at issue should be admitted. *Pearson v. State*, 182 Md. 1 (1943). The hypodermic and other paraphernalia were taken from the automobile in which appellant was driven to and departed from the institution. The search which divulged it was chronologically proximate to the crime charged. It tended to prove that appellant at least consorted with narcotics users and supported the reasonable inference that he was in a position to come into possession of the narcotics passed to the prisoner. It was relevant to the issue and tended to establish it. *Hopkins v. State*, 193 Md. 489 (1949). As to the argument that there was not sufficient connection between the appellant and the hypodermic and other paraphernalia, probability is the

only requirement. If there is any doubt, the decision is on the weight of the evidence, not on any question of its admissibility. *Lingner v. State,* supra.

Appellant contends that the evidence was insufficient to sustain the conviction. The findings of the trial judge will not be disturbed unless clearly erroneous. Maryland Rule 1086; *Tucker v. State,* 244 Md. 488 (1966). We find enough legally sufficient evidence or proper inferences therefrom from which the trial judge could find appellant guilty beyond a reasonable doubt. *McCray v. State,* 236 Md. 9 (1964). We find no merit in appellant's contention that he may have been in "control" of the heroin but was not in "possession" of it as charged. The statute makes possession of narcotics and the control of narcotics two separate offenses. We give the word "possession" its ordinary meaning and the evidence clearly supported the finding of the trial judge that appellant was in possession of the narcotic. See *Bryant v. State,* 229 Md. 531 (1962).

*Judgment affirmed.*