## BUFORD LINWOOD ST. CLAIR *v.* STATE OF MARYLAND

[No. 41, Initial Term, 1967.]

*Decided August 11, 1967.*

The cause was argued before ANDERSON, MORTON, and ORTH, JJ., and MACGILL, J., Chief Judge of the Fifth Judicial Circuit, specially assigned, and JENIFER, J., Associate Judge of the Third Judicial Circuit, specially assigned.

*Glenn O. Hall, Jr.,* for appellant.

*Edward F. Borgerding, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, Arthur A. Marshall, Jr., State's Attorney for Prince George's County,* and *Edward P. Camus, Assistant State's Attorney for Prince George's County,* on the brief, for appellee.

MACGILL, J., delivered the opinion of the Court.

A jury in the Circuit Court for Prince George's County found the appellant guilty of breaking a dwelling house in the daytime with intent to commit a felony therein and grand lar-

ceny. From the judgment of the court he has appealed, contending that the articles allegedly stolen from the dwelling should not have been received in evidence against him because they had been secured as the result of an unlawful search and seizure. He also complains (a) that the State failed to establish a proper chain of custody of the stolen goods, (b) that the trial judge erroneously charged the jury with reference to the provisions of Section 32 of Article 27 of the Code, rather than with reference to the provisions of Section 30 (b) of the Article, and (c) that no witness identified him in court and that there was no evidence produced to establish that the breaking occurred in the daytime.

On August 3, 1965 James A. Braswell returned from a trip to South Carolina and found that his home near Upper Marlboro had been broken into during his absence, and that certain articles of an aggregate value in excess of $100.00 were missing. He notified the Prince George's County police and furnished a description of the missing articles. On August 6 or 7, the police put out a teletype message "to the general area" advising of the stolen goods.

At 11:15 a.m. on August 7, 1965, Trooper Rhodenizer of the Virginia State Police observed the appellant asleep in his automobile, which bore Alabama license plates, on State Route 800, near the town of Salem in Roanoke County, Virginia. The trooper also observed two television sets in open view on the floor of the vehicle. He roused the appellant and, in response to inquiries made by the trooper, appellant produced his California driver's license, bearing an Orange, California, address, and his registration papers for the vehicle, showing it to have been titled in Alabama to appellant. Appellant told the officer that he owned the television sets; that he had come from California via Alabama to look for work in Virginia and Maryland; and that as he had arrived in the area late at night, and did not want to awaken relatives with whom he intended to stay, and who lived but a short distance from where he was parked, he decided to spend the night sleeping in his car. The trooper knew of appellant's relatives and also knew that they lived in the immediate area. Satisfied with appellant's explanation, the trooper began to drive away, but as he did so, he

checked the name of the appellant by police radio with his dispatcher. He was immediately informed of the existence of a teletype message to the effect that appellant was wanted by California authorities "for violation of parole and burglary." The trooper halted the appellant, who was then driving off, and informed him that there was a teletype message for his arrest, and that he would be taken before a justice of the peace in Salem. Appellant then requested permission to remove an article of clothing from the trunk of his car. When the trunk lid was raised, the trooper observed a number of articles in the trunk, including a vacuum cleaner, a floor fan, a record player, a slide projector and a sewing machine. The trooper, at that time, believed that these articles were owned by appellant, although as it was later learned they were part of the goods stolen from Braswell.

The trooper, after searching appellant's person, took him in his police car to a justice of the peace in Salem, which was approximately twelve miles from the scene of the arrest. The trooper there obtained a fugitive warrant on the strength of the teletype message—the message containing information that California authorities were seeking appellant for "violation of probation, burglary"; that California authorities would extradite; that appellant was last seen on July 30, 1965 in Washington, D. C. driving a car with Alabama license plates; that he had there attempted to use a credit card stolen in a burglary in Texas; and that Texas authorities also wanted appellant.

Upon his failure to post the requisite bond to secure his release, appellant was incarcerated in the Salem jail, immediately after which the trooper returned to the appellant's car, bringing his Sergeant with him so that the latter could drive it into Salem. The car was thereafter returned to Salem and parked near the jail. Rhodenizer, in his testimony at the trial, stated that "because we were responsible for them," the contents of appellant's vehicle, including those in the trunk, were promptly removed by the State Police, inventoried by the serial number on each of the articles, and placed in the custody of the Sheriff.

The articles remained in the Sheriff's custody for about four days when, due to a shortage of space in the Sheriff's office, the State Police were required to move the goods back into ap-

pellant's car, which was still parked adjacent to the jail. Appellant, having signed a waiver of extradition, was returned to California on the fifth day following his arrest. On August 19 —twelve days after appellant's arrest—a list of the articles taken from his car was "run on the teletype as police information, found," which, according to Trooper Rhodenizer's testimony, meant that they were listed as having been found in appellant's possession "just for general police information over the teletype network." On August 20, Prince George's County police, responding to the Salem teletype, advised that the goods had been stolen. Trooper Rhodenizer then took the articles from the trunk of appellant's car and placed them in the storage room in the State Police headquarters in Salem.

Rhodenizer testified that after inventorying the contents of appellant's car, appellant told him that he would like his brother-in-law to have his vehicle and to this end, the trooper "assisted him in drawing up papers giving his brother-in-law the power of attorney to get a Virginia title." Testifying in response to the question—"Did he [appellant] say anything about what he would like you to do with the goods in the car," the trooper said:

> "No, not specifically. He mentioned his sister and he
> indicated that he would like her to get what he had."

Elaborating on his testimony that he felt "responsible" for the contents of appellant's car, Rhodenizer testified that in the circumstances under which appellant was arrested, the "practice" was "to inventory each item that we find in the vehicle and leave them for safekeeping."

Appellant was not asked nor did he consent to the inventory and removal of the articles from his car. No search warrant was obtained to search the vehicle because, as Trooper Rhodenizer testified: "He had no reason to suspect that any items in the car were stolen."

Testifying in his own behalf at the trial, the appellant stated that immediately after his arrest he asked permission to drive his car to the home of his relatives, approximately one quarter of a mile from the point of the arrest; that the trooper refused to grant such permission, instead telling him to "leave it there

and lock it up;" that he told the trooper "one door won't lock, and I've got some stuff in it I don't want nobody to take;" and that he thereafter gave the keys of the car to the trooper and told him to give the keys to his brother-in-law so that his brother-in-law could drive the car to his house.[1]

The stolen articles taken from appellant's car following his arrest were received in evidence at the trial over his objection. Appellant contends on this appeal, as he did below, that the search of his vehicle was not incident to his arrest for parole violation and, in any event, was too remote in time and place from the arrest to be classified as a search incident to an arrest. He contends that the search was but an exploration for incriminating evidence. The State, on the other hand, contends that the search was lawful as incident to a valid arrest or, alternatively, that there was no search or seizure, but rather only a taking of the articles into "protective custody;" and when it was subsequently learned that the articles were stolen, then the seizure thereof was entirely legal.

The initial question before us is whether, in the circumstances of this case, the inventory and removal by police of the contents of appellant's car constituted an unreasonable search and seizure in violation of the Fourth Amendment to the Federal Constitution. Manifestly, if such police action constituted a "search" in the constitutional sense,[2] it can survive constitutional inhibition only upon a showing that the surrounding facts bring it within one of the exceptions to the rule that a search must rest upon a search warrant. See *Preston v. United States,* 376 U. S. 364 (1964); *Stoner v. California,* 376 U. S. 483

---

1. Rhodenizer testified that at the time of the arrest appellant told him "that it would be all right to take his car down to Poffs." While the trooper was familiar with this name, he did not know what, if any, relation he bore to appellant.

2. A search within the ambit of Fourth Amendment protection implies some exploratory investigation. *Kershaw v. State,* 199 Md. 135 (1952). More explicitly, a "search" in the constitutional sense implies an invasion and quest, a looking for or seeking out; prying into hidden places for that which is concealed. See *State v. Blackwell,* 415 P. 2d 563 (New Mexico 1966); *Lindsey v. State,* 204 N. E. 2d 357 (Ind. 1965); *People v. McCracken,* 197 N. E. 2d 35 (Ill. 1964); *State v. Reagan,* 328 S. W. 2d 26 (Mo. 1959).

(1964). One such exception—that of consent—is clearly not applicable, since at no time did appellant consent to the entry into and removal of the contents of his vehicle. Another exception to the rule—that which authorizes a search incident to a valid arrest — is likewise inapplicable under the facts of this case. The police expressly disavowed making any "search" of the vehicle, either incident to the arrest or otherwise. They sought to justify their action on the ground that under the circumstances they were responsible for the contents of appellant's vehicle and consistent with their practice in such cases, their object in removing such contents was to place them in safe-keeping. Indeed, as the appellant had been incarcerated at the time his vehicle was first entered and inventoried by police, and as the police entertained a *bona fide* belief that the appellant owned both the vehicle and its contents, they could not have searched the vehicle incident to the arrest under any of the traditional justifications therefor, i.e.—the need to seize weapons and other things which might be used to assault an officer or effect an escape, and to prevent the destruction of evidence by the arrested person. See *United States v. Rabinowitz,* 339 U. S. 56 (1950) and *Agnello v. United States,* 269 U. S. 20 (1925).[3]

While it may also be, as argued by appellant, in reliance upon *Preston v. United States, supra,* that the "search" could not be justified as incident to a valid arrest because it was too remote in time and place, we need not decide that question in view of our other reasons for concluding that the entry into appellant's vehicle was not incident to his arrest.[4]

---

3. These classic justifications for the doctrine of search incident to an arrest may not necessarily be exclusive. See *People v. Webb,* 424 P. 2d 342 (1967) and *Crawford v. Bannan,* 336 F. 2d 505 (1964).

4. We note, however, that numerous decisions interpreting *Preston* have concluded that that case does not stand for the proposition that all searches without warrant of a suspect's car other than at the immediate time and in the immediate vicinity of the arrest are *ipso facto* unreasonable within the meaning of the constitution. See, for example, *State v. Wilson,* 424 P. 2d 650 (Wash. 1967); *People v. Webb, supra; Stewart v. People,* 426 P. 2d 545 (Col. 1967); *Draper v. Maryland,* 265 F. Supp. 718 (1967); *State v. Darabcsek,* 412 S. W. 2d 97 (Mo. 1967); *Boyden v. United States,* 363 F. 2d 551

The rule requiring a search warrant as a prerequisite to a valid search has further exceptions. In *Cooper v. California,* 386 U. S. 58 (1967), the Supeme Court upheld the warrantless search of a motor vehicle, not incident to an arrest, where such vehicle had been lawfully impounded and made subject to a statutory forfeiture proceeding because of its illegal use in connection with the transportation of narcotics. In that case, appellant had been arrested for a narcotics violation and his car impounded by police. A week later, the vehicle was searched and incriminating evidence of the narcotics violation was discovered. Under California law the police were required to seize the vehicle and to hold the same as evidence until a forfeiture had been declared or a release ordered. The court held that the search of the car was not incident to the arrest, thus distinguishing *Preston,* and further held that it was reasonable under the Fourth Amendment. It concluded that while lawful custody of an automobile does not of itself dispense with the constitutional requirements of searches thereafter made of it, "the reason for and nature of the custody may constitutionally justify the search." The forfeiture proceedings were prolonged, taking four months to conclude, and although there was never any assurance at the time of the search that the car would be forfeited, the court nevertheless said:

> "* * * It would be unreasonable to hold that the police, having to retain the car in their garage for such a length of time, had no right, even for their own protection, to search it * * *."

While *Cooper* thus makes it plain that a warrantless search of a vehicle may be reasonable without being incident to an arrest, unlike the factual situation in that case, appellant's car was not required to be seized by State law at the time of his

(9th Cir. 1966); *Rodgers v. United States,* 362 F. 2d 358 (8th Cir. 1966); *State v. McCreary,* 142 N. W. 2d 240 (S. D. 1966); *State v. Schwartzenberger,* 422 P. 2d 323 (Wash. 1966); *State v. Wood,* 416 P. 2d 729 (Kan. 1966); *People v. Robinson,* 402 P. 2d 834 (Cal. 1965); *Price v. United States,* 348 F. 2d 68 (U. S. App. D. C. 1965); *State v. Putnam,* 133 N. W. 2d 605 (Neb. 1965); *Crawford v. Bannan, supra.*

arrest. Neither did it constitute evidence of any crime, nor was it subject to a statutory forfeiture proceeding. That these factors need not necessarily be present to authorize a warrantless search of a motor vehicle properly in police custody where the circumstances show the search to be otherwise reasonable is nevertheless abundantly clear from the decisions. As the court observed in one such case. *People v. Prochnau,* 59 Cal. Rptr. 265 (Cal. Dist. Ct. App. 1967): "The core of the matter is not whether the police officers acted without express authority in State law in impounding the car; it is whether its subsequent conduct was reasonable in the light of the constitutional guarantees with respect to the matter of search and seizure."

Thus, in *Heffley v. State,* 423 P. 2d 666 (Nev. 1967), Heffley was arrested in his car in which he had a large number of guns in plain view on the back seat. Charged with unlawful possession of a pistol, he was taken to the police station, and thereafter, his vehicle was impounded by police, searched, and stolen articles discovered therein. The court held in effect that while the search could not be justified as incident to the arrest in light of *Preston,* nevertheless it was not constitutionally unreasonable under the circumstances. Noting that the police "had a responsibility to inventory the property, for if it later developed that Heffley owned the guns and the automobile, they would be responsible for their safekeeping," the court stated:

> "* * * If the search is for the purposes of inventory of personal effects and not exploratory, articles found as a result which supply the foundation for a reasonable suspicion on the part of the police are not subject to unlawful search and seizure. This is so because the police are in a place where they have a right and obligation to be, as in this case, when they find the objects of seizure.
>
> * * *
>
> "The police officer, when there is just cause, has a duty not only to impound a car from the public highway for its own protection, but also to inventory the contents so that they may be safeguarded for the owner. Such practice is deemed necessary to defeat

dishonest claims of theft of the car's contents and to protect the temporary storage bailee against false charges. * * * If, however, the policing conduct indicates that the intention is exploratory rather than inventory the fruits of that search are forbidden. * * * Unfortunately, distinguishing inventory from exploration may prove to be ambitious and unprecise. We can only say that each case must be determined upon its own facts and circumstances.

* * *

"In this case from the time of seizure of the car until the inventory at the police station, the vehicle was in the lawful custody of the officers. In these circumstances the search without a warrant of defendant's automobile could not be said to be 'unreasonable.' It is only unreasonable searches that are prohibited by the Constitution. *United States v. Rabinowitz,* 339 U. S. 56, 70 S. Ct. 430, 94 L. Ed. 653 (1950)."

In *Cotton v. United States,* 371 F. 2d 385 (9th Cir. 1967), Cotton was accosted by police in an alley late at night while in his car with the lights out. He was arrested for disturbing "private places," and removed from the scene of the arrest, after which his car was towed away to the police impound. As the arresting officer felt that "after arresting the man, I am responsible for the vehicle and the property in it," the car was entered and examined by police, it thereby being ascertained that the car had been stolen. In the course of its opinion, in which it found no merit to appellant's contention that the search of his vehicle was unconstitutional under the Fourth Amendment, the court said:

"* * * Cotton having been validly arrested and taken to the police station, the officer would have been derelict in his duty if he had left the car unattended in a dark alley in the middle of the night. The police have as much a duty to protect the property of a suspect as they have to protect the property of the rest of us, and that is what they did in this case by towing the car to the police impound. They also had a duty to keep a

record of the property that they had impounded so that it could be returned to the suspect or to its owner in due course. For reasons stated below, we do not think that the mere opening of the door of the car for the purpose of making such a record was, under the circumstances, a search, but if it was, the circumstances under which it was done make that search an entirely reasonable one. Cf. *Boyden v. United States,* 9 Cir., 1966, 363 F. 2d 551. The Constitution prohibits only unreasonable searches and seizures. *United States v. Rabinowitz,* 1950, 339 U. S. 56, 60, 70 S. Ct. 430, 94 L. Ed. 653."

In *Fagundes v. United States,* 340 F. 2d 673 (1st Cir. 1965), a policeman arrested the occupants of a partially wrecked vehicle for drunken driving and took them to a police station in his car, after which he returned to the scene of the accident and attempted to remove the vehicle to the police station. Being unable to move the vehicle, the officer called for a tow truck. While waiting, the officer undertook to secure the contents of the car from the weather, for it was raining at the time and the back window was broken out. In doing so, the officer saw a woman's handbag lying open on the car seat with bundles of money in plain sight in it. The officer took the bag and money from the vehicle without a search warrant and ensuing investigation developed that the money had been stolen. The court, noting that the officer's purpose was not to search the vehicle, but rather to protect its contents from the inclement weather, concluded that there was no "search" in the legal sense of the Constitution. See also *Harris v. United States,* 370 F. 2d 477 (U. S. App. D.C. 1966) and *People v. Manzi,* 237 N. Y. S. 2d 738 (1963), aff. 248 N. Y. S. 2d 306 (1964). Cf. *Williams v. United States,* 170 A. 2d 233 (D. C. Mun. App. 1961).

In *People v. Ortiz,* 305 P. 2d 145 (Dist. Ct. App. 1956), the defendant, under arrest for "drunk auto" was incarcerated and thereafter the officers made an inventory of the items of personal property in his car preliminary to impounding it, in the course of which marijuana was found in the glove compartment. Rejecting a contention that such evidence was ille-

gally seized, the court held that the police were entitled to impound the car under the motor vehicle code and that:

> "In the circumstances of this case it was not unreasonable for the police officer to make an inventory of the contents of the automobile prior to impounding it. Such inventory was a protection to the owner of the vehicle, the garage owner, and the officer. Since the marijuana was found during the course of making the inventory, it was not discovered as a result of an unreasonable search and therefore it was not inadmissible in evidence."

To like effect, see *People v. Prochnau, supra* and *People v. Garcia,* 29 Cal. Rptr. 609 (Cal. Dist. Ct. App. 1963).

Thus, the relevant test is whether the search was reasonable under all of the circumstances, for it is only unreasonable searches that are prohibited by the Fourth Amendment. *Carroll v. United States,* 267 U. S. 132 (1925); *Stewart v. State,* 1 Md. App. 309 (1967). And that which is reasonable cannot be determined by any fixed formula, *United States v. Rabinowitz, supra,* nor can it be stated in rigid and absolute terms, *Harris v. United States,* 331 U. S. 145 (1947). In short, whether a search and seizure is reasonable within the meaning of the Fourth Amendment depends upon the facts and circumstances of each case. *Cooper v. California, supra.*[5]

While the action of the police in removing the contents of appellant's car cannot be fitted squarely within one of the usual exceptions to the rule that a search, to be reasonable, must rest upon a search warrant, the ultimate test, as we see it, is whether the search was "otherwise reasonable." See *United States v. Rabinowitz, supra,* at p. 64. Under the circumstances of this case, we hold that the warrantless entry of police into appellants' vehicle—whether that action be considered a "search" within the meaning of the Constitution, or not—was reasonable and, as such, not in violation of the Fourth Amendment.

---

5. Searches of motor vehicles without a warrant may under some circumstances be reasonable, although the result might be the opposite in a search of a home, store, or other fixed piece of property. *Preston v. United States, supra,* at p. 366.

That appellant had been lawfully arrested on the basis of the information from official sources that a warrant was outstanding for his arrest cannot be doubted and appears conceded by appellant. See *People v. Webb, supra; United States v. Yant,* 373 F. 2d 543 (6th Cir. 1967); *Jones v. State,* 242 Md. 323 (1966). And after the appellant had been incarcerated in the Salem jail, unable to make bail and facing immediate extradition to California, the police would have been derelict in their duty had they left the vehicle remain at the scene of the arrest, particularly since they knew that it contained a large number of valuable articles, that the door would not lock, and that two television sets were in plain sight in the vehicle. The action of the police in returning the car to Salem could hardly be considered unreasonable and viewed in this light, we think police custody of the vehicle was lawful.[6] When the police thereafter undertook to inventory the contents of the vehicle they did not suspect that any of the articles therein contained had been stolen, and we are satisfied on the record before us that they entered the car for the purpose of safeguarding appellant's personal property—both for their own protection as well as that of appellant—and not for the purpose of making an exploration for incriminating evidence. Had the police suspected that appellant's vehicle harbored evidence of crime, they had the undoubted right to search the vehicle at the scene of the arrest (see *Gaudio and Bucci v. State,* 1 Md. App. 455 (1967))—a right they did not exercise because, as Trooper Rhodenizer testified, he was fully satisfied that appellant owned both the car as well as its contents. The trial judge was clearly so persuaded since he found as a fact during the trial that the sole purpose of police in making a list of the property was "to see that it was preserved against loss for the owner."

---

6. The record shows that after appellant told police to give his car to his brother-in-law, Trooper Rhodenizer undertook to assist appellant in making a title transfer of the vehicle to the brother-in-law, and the car was ultimately turned over to him. The fact that the police did not deliver the car to appellant's brother-in-law at the time of the arrest, does not, in our opinion, detract from our conclusion that, at the time of the inventory, police had lawful custody of the vehicle, all circumstances being considered.

Since the critical time by which the constitutionality of the "search" is to be assessed is that point in time when the initial police entry into the car was made, the fact that police subsequently removed the stolen articles from the Sheriff's office back into appellant's vehicle, or that police, twelve days after the arrest, broadcast a description of the articles in question, does not alter our conclusion that the search, when made, was reasonable.[7]

In holding that the guarantees of the Fourth Amendment were not violated by the action of police in removing the contents of appellant's vehicle under the circumstances of this case, we are not unmindful of the difficulty likely to be encountered in distinguishing a *bona fide* inventory from a mere subterfuge to search. But, as pointed out in *People v. Roberts,* 303 P. 2d 721, 724 (Cal. 1956)—a case holding a warrantless search of a home based on an emergency situation to be reasonable under the Fourth Amendment—"The fact that abuses sometimes occur during the course of criminal investigations should not give a sinister coloration to procedures which are basically reasonable." It is for the trier of fact to see that no subterfuge creeps in and we are here satisfied that none did. See *Davis v. State,* 236 Md. 389 (1964).[8]

Appellant next contends that the stolen articles should not have been admitted in evidence since the State failed to connect him with such articles, or to establish a proper chain of custody

---

7. It is altogether probable that the police broadcast was prompted by the receipt, just prior to appellant's extradition, of a warrant from Texas charging him with burglary, although, as the evidence showed, the warrant "did not name these particular items."

8. While not directly in point, attention is invited to the decision of the Supreme Court of New Jersey in *State v. Boykins,* 232 A. 2d 141 (1967), a case holding a warrantless search of a vehicle to be constitutionally permissible, though not incident to an arrest, or based upon probable cause to believe that a specific crime had been committed, or that the vehicle contained goods that offended against the law, where the circumstances were such as to "plainly suggest the driver and his passengers * * * were involved in some substantial criminal affair," which in turn suggested "a probability that the occupants had on their persons or in the car contraband or implements or the fruits of the crime."

leading from himself to the presentation of the articles in evidence at the trial. We find no merit to this contention. A number of the stolen articles were observed by the trooper in the car at the time of the arrest. They were locked up in the car for a brief period subsequent to the arrest, and all of them were thereafter identified by the trooper as having been taken from appellant's car. Braswell, the owner of the goods, identified them as his property and as being in substantially the same condition as when he last saw them in his home, although somewhat damaged. Appellant does not contend that the articles were not in his car when arrested.

It is well settled that only a probability that the stolen articles were connected with the appellant is required to be shown in order to render them admissible in evidence. *Abney v. State,* 244 Md. 444 (1966) ; *Reynolds v. State,* 219 Md. 319 (1959) ; *Stewart v. State, supra.* We also have no difficulty in concluding that the goods taken from appellant's car were in it when he was arrested, that they were owned by Braswell, and, all the circumstances considered, that a reasonable probability existed that no tampering occurred. See *Avey v. State,* 1 Md. App. 178 (1967), at p. 187.

We find no substance in the contention that there was prejudicial error in the court's charge to the jury. It is true that the jury was erroneously advised that the first count in the indictment was laid under Section 32 of Article 27 of the Code (Breaking outhouse with intent to commit felony) rather than under Section 30 (b) of the Article (Breaking a dwelling house in the daytime). The Legislature in 1965 deleted from Section 32 the words "breaking a dwelling house in the daytime with intent to commit murder or felony therein, or with intent to steal, take or carry away the personal goods of another of any value therefrom" and incorporated them in a new subsection under Section 30. The judge's charge, however, advised the jury of the essential elements of the crime under the proper section and it can scarcely be surmised that the jurors were confused or misled by an erroneous reference to a section number of an article in the Code. In any event, since there was no exception made on behalf of the appellant to the charge, the matter is not before us for review. Maryland Rules 756 f and g and 1085 ; *Culver v. State,* 1 Md. App. 406 (1967).

The appellant raises the point that no witnesses at the trial identified him, by the act of pointing to him, as the person referred to in the testimony. He has cited no Maryland authority that establishes such a requirement. In any event, he admitted, when he took the stand in his own defense, that Trooper Rhodenizer had arrested him under the circumstances described by the trooper.

The final contention that the evidence did not establish a breaking of Mr. Braswell's dwelling house in the daytime, as opposed to the nighttime, presents a point which does not appear to have been considered heretofore by the Court of Appeals. The appellant's possession of the stolen property justified an inference of fact that not only was he the thief but that he was also the burglar. *Boggs v. State,* 228 Md. 168 (1962); *Lewis v. State,* 225 Md. 474 (1961); *Anglin v. State,* 244 Md. 652 (1966); *Anglin v. State,* 1 Md. App. 85 (1967). Mr. Braswell and his family left their home on the night of Friday, July 30, 1965, and returned on the night of Tuesday, August 3. On cross-examination Mr. Braswell was asked: "Do you actually know of your own knowledge whether or not your house was broken into on Friday, Saturday, Sunday or Monday, any of those days?" He answered: "No sir, I do not know which day. I know the doors that were open when I returned home were not open on Saturday or Sunday during the day and could have been opened after dark Sunday."

In the case of *Jones v. State,* 63 Georgia 141 (1879), where the appellant had been convicted of burglary in the daytime upon evidence which failed to establish that the burglary had, in fact, been committed in the daytime, his conviction was reversed, the court saying that: "To prove a burglary was committed in the day or in the night, one or the other, is certainly not to prove beyond a reasonable doubt that burglary in the daytime was committed." Other courts, in more recent decisions, have reached a contrary and, we think, a more reasonable conclusion. In *Ledger v. State,* 285 S. W. 2d 130 (Tenn. 1955), the proof showed that the offense could have been committed in either the nighttime or the daytime. The appellants were convicted of breaking into a dwelling house in the daytime. Under the Tennessee criminal code the nighttime offense was defined

as at common-law and carried a heavier penalty than burglary in the second degree which was defined as: "the breaking and entering a dwelling house by day with the intent to commit a felony." The court, citing *State v. Newell*, 106 A. 561 (Vt. 1919), stated that burglary in the second degree was not a different offense from common-law burglary but was merely a lesser degree of the same offense and was of the opinion that: "when the proof fails to show the time of the offense then the burglar may be punished under the statute providing the lesser penalty." For other cases applying similar reasoning, see: *State v. Jordan*, 54 N. W. 63 (Iowa 1893); *State v. Rice*, 144 P. 1016 (Kan. 1914) and *State v. Newell, supra.*

We think that Section 30 (b) of Article 27, which incorporates both the definition of common-law burglary and the provisions of Section 30 (a) of the Article but substitutes "daytime" for "nighttime" and provides for a lesser penalty, is analogous to the statutes construed in the cases cited and warrants a similar construction. We find, therefore, no merit in the appellant's contention.

*Judgment affirmed.*