# DAVID PHILLIP BROWN *v.* STATE OF MARYLAND

[No. 116, September Term, 1970.]

*Decided December 1, 1970.*

464

The cause was argued before ORTH, THOMPSON, and MOYLAN, JJ.

*Thomas G. Bodie* for appellant.

*Donald Needle, Assistant Attorney General,* with whom were *Francis B. Burch, Attorney General, Samuel A. Green, Jr., State's Attorney for Baltimore County,* and *Stuart E. Hush, Assistant State's Attorney for Baltimore County,* on the brief, for appellee.

ORTH, J., delivered the opinion of the Court.

On 18 April 1966 David Phillip Brown (appellant) and Jerry Wayne Montgomery were jointly indicted, the grand jury of Baltimore County presenting that on 4 May 1965 they "* * * feloniously, wilfully and of their deliberately premeditated malice aforethought, did kill and murder Richard Leroy Greene * * *." On June 2, 1967 the Circuit Court for Baltimore County denied appellant's

motion to dismiss indictments against him [1] and an appeal therefrom was noted. We affirmed the order denying the motion, holding that the delay from indictment to trial was less than substantial and that appellant had not shown a strong possibility of prejudice. *Brown v. State,* 4 Md. App. 141, decided 26 April 1968. Mandate issued and was received by the lower court 10 June 1968. On 7 August 1968 he filed another motion to dismiss the indictments for lack of a speedy trial. At the hearing thereon he produced no evidence, testimonial or otherwise, which showed he had suffered actual or possible prejudice from any further delay in trial. The motion was denied by order of 23 September 1968 of the Circuit Court for Baltimore County. An appeal was again noted and argued before this Court. By opinion decided 12 June, *Brown v. State,* No. 142, September Term, 1968, unreported, we affirmed the order of the lower court, finding that the right to a speedy trial had not been denied and that the provisions of the Intrastate Detainer Act, Code, Art. 27, § 616S, in the circumstances, did not entitle him to a dismissal of the indictments. Mandate issued and was received by the lower court on 15 July 1969. On 22 August appellant filed a petition for employment of a private investigator, stating that trial had been set for 10 September. By order the same date the lower court authorized the employment of a private investigator as requested. On 11 September the indictment came on for trial in the Circuit Court for Baltimore County. Appellant was tried before a jury, found guilty of murder in the first degree and sentenced to life imprisonment. He appeals from the judgment.

I

Appellant again asserts that he was denied a speedy trial. Our opinions on appeal from the two previous denials of motions to dismiss the indictments have adjudicated that appellant was not denied a speedy trial as of

---

1. They were also indicted on 18 April 1966 for assault and robbery.

23 September 1968. Thereafter any delay in trial until 15 July 1969 was due to the appeal initiated by appellant and was not chargeable in any way to the prosecution. Delay from 15 July 1969 to the date trial was actually had was not a delay of constitutional dimension. Further appellant did not demand trial on a date earlier than that set on our remand and it is apparent from his petition to employ a private investigator that he would not have been prepared for trial before the date set in any event. We hold that appellant's right to a speedy trial was not denied by the trial had on 11 September 1969.

## II

Richard Leroy Greene, age 17 years, worked at the Scot Gas Station on North Point Blvd. near Wise Avenue in Baltimore County. He was the only employee there on 4 May 1965. About 4:45 P.M. when the manager of the station returned from a meeting in Washington, the station was open—the oil racks and credit machine were outside and the gas pumps were turned on—but the door to the station office was locked. Unlocking the door he found Greene on the floor between a safe and a desk. There was a bullet hole in the back of Greene's head and he was dead. About $37 had been stolen from the safe. The Medical Examiner classified the death as homicide; the manner of death was a gunshot wound in the head.

Alvin A. Winship, called by the State, testified that he was in the Scot Station shortly after noon on 4 May 1965. His car was serviced and he bought some crackers and cigarettes inside the station. While inside the station a man came from the "lubritoreum" and "looked over the window with his leg up on the window sill and I passed him on the way out." He was white, "young, curly hair or that type of profile, and thin face as opposed to a heavyset individual." That person was in the station when Winship left. The transcript reads:

"(by Assistant State's Attorney):
Q. Mr. Winship, I have visited you at your home

the other evening, Monday evening of this week?

A. Yes.

Q. I showed you some pictures, did I not?

A. Yes.

Q. Prior to showing you those pictures, did I in any way point out any picture to you?

A. No.

Q. Did I in any way do anything to influence you in looking at those pictures?

A. You asked me to look at the pictures.

Q. And did you look at the pictures?

A. I did.

Q. What if anything did you do as a result of looking at the pictures?

A. Then you asked me if there was anyone in particular that I could recognize and I couldn't identify anyone from the pictures. However, if I had to choose a face from the choice, I'd choose a face.

Q. You didn't say that was the face?

A. I can't. No.

MR. SUTLEY: (defense counsel) Objection to any more testimony on this point.

THE COURT: I don't know what the testimony will be. I would be prematurely ruling on the objection, Mr. Sutley. Overruled.

Q. Mr. Winship, I show you a group of pictures and ask if these are the same pictures that I showed Monday evening?

A. Uh-huh. In my opinion it is this picture."

The State introduced "this one proof", appellant objected and the objection was overruled. On cross-examination it was elicited that Winship was shown five pictures and out of them the one introduced in evidence was "the most likely to resemble the person" he saw in the gas station but "I cannot make a positive identification." Appellant claims the admission of the photograph over his objection was reversible error.

Whether or not a witness made a judicial identification of an accused, he may testify as to an extrajudicial identification made by him. If the extrajudicial identification is by a viewing of photographs, evidence as to it is admissible if the identification procedure was legal, that is not so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification. When so admitted it is substantive proof of identity. See *Holmes v. State,* 10 Md. App. 253. When such evidence is challenged, the burden is on the defendant to show *prima facie* that the viewing procedure was illegal and if he does so the burden shifts to the State to show by clear and convincing evidence that it was legal. See *Smith and Samuels v. State,* 6 Md. App. 59. We see nothing in the record here compelling the conclusion that the photographic viewing procedure was illegal. Evidence that the witness identified a photograph of appellant as being that "most likely to resemble" the man he saw in the gas station was admissible for what it was worth. The lack of a positive identification did not render it inadmissible but the weight to be given it was for the jury. *Hernandez v. State,* 7 Md. App. 355, 363-364. Evidence that the witness had selected a photograph as most likely to resemble appellant being admissible, it was not error to place the photograph selected before the jury.

### III

Edwin Leroy Randall and George Wesley Johnson, Jr. were called to testify on behalf of the State. Randall was obviously a reluctant witness but it was elicited from him that he met appellant when each was in the "Anne Arundel County" jail in May 1965; he had not known him before. They were incarcerated on the same tier but in different cells. Appellant said he was in for a service station holdup. "I think he was supposed to have loaded the gun up. * * * Gave it to Montgomery * * * that is when Montgomery held a man up and the man gave him money and he is supposed to have shot the man." On cross-examination Randall said appellant never denied that he

was at the scene of the crime. Johnson said he met appellant when both were inmates on the same cell block in the "Annapolis County" jail the latter part of May 1965. Montgomery was also there. "They had just come back, Brown and Montgomery had just come back from a lineup. * * * Montgomery said he didn't understand how he got picked out in the lineup because when he shot this kid, there wasn't anyone around — and Brown said — yes, he couldn't figure it out because he loaded the gun in the bathroom * * * Mr. Brown was saying that he was sure that they wouldn't find the gun. It was a twenty-two snub-nosed revolver that he had thrown in the Patuxent River and Mr. Montgomery checked him and said, it wasn't the Patuxent River, it was the Patapsco River in Westport."

Appellant contends that neither the testimony of Randall or Johnson was admissible because it was so vague and inconclusive as to be irrelevant — that its probative value was outweighed by its prejudicial effect. We do not agree. The court is vested with sound discretion with regard to the reception or rejection of evidence. *Tomolillo v. State,* 4 Md. App. 711, 716. *Stewart v. State,* 1 Md. App. 309, 317. There was reasonable probability that the robbery discussed by appellant and Montgomery was connected with the offense for which appellant was on trial. We cannot say that the trial court abused its discretion in admitting it. It was the jury's function to weigh the evidence and determine the credibility of the witnesses. *Bieber v. State,* 8 Md. App. 522.

## IV

Corporal Armand C. Elliott of the Baltimore County Police Department was called to testify in behalf of the State.[2] On 27 May 1965 he was assigned "to go to the Ferndale Police Station and be processed and from there

2. Corporal Elliott said that he had been a member of the Baltimore County Police Department for eighteen years and eight months. He had been attached to the investigation department for fifteen years. He had been on "special detail" over two hundred times.

go to the Annapolis jail to investigate a homicide." At Ferndale he was fingerprinted and photographed. He was then handcuffed and taken to the Annapolis jail with "other prisoners." He was placed in the A tier.[3] Appellant was in that tier. About an hour later he, appellant, Montgomery and other prisoners were transferred to the "D side" of the jail. "As we were walking up the tier to the D side, * * * the subject Montgomery, he came rushing down here and he brushed past me and came up to Mr. Brown here * * * He put his arm around him, very excited, and grabbed him by the * * * hand, real excited, and grabbed his hand and pulled him into cell number four. * * * I followed them right in, straight behind them and went up to the cell and just stood by myself by the cell door because there is a long tier on the D side. And the doors were open, you see. * * * It is a small area, closer than what was on A section. I stood by the door and I glanced at the cell again and I saw Montgomery still holding Brown's hand and he was talking very excitedly." Elliott was asked by the State how far he was from Brown and Montgomery. "I would say about two feet, there sits a little sort of a cot at the door, right there, and the cot runs along the wall and they were sitting right here and I was right outside the door, sitting there. * * * I heard Montgomery say 'Look, Dave, listen to me now, did you tell them anything about the filling station over in Dundalk?' David Brown stated, 'No, I ain't said nothing to nobody.' And Montgomery said, 'Man, now keep your mouth shut and we won't have nothing to worry about and don't say anything about being at that filling station on North Point Road, the only guys we have to worry about is that colored guy I was fussing with and that white-haired guy.' Montgomery further stated to David Brown, 'You were standing over near the desk and he was in the middle of the floor; he couldn't

---

3. It appears from the testimony of Randall and Johnson, see *supra*, that a tier is a narrow aisleway with cells on it. The doors to the tier are locked but the doors to the cells on the tier are open all day so prisoners on the tier have free access to all the cells.

see behind the desk.' And David Brown said, 'Man I didn't know you were going to shoot the guy, you did it so quick [pow] and it was all over.' Montgomery sort of shouted, 'Well, he jumped at me, didn't he?' And David Brown said, 'Yes, he did jump at you, but what about that white-haired guy, he could have been around back somewhere?' Montgomery stated, 'Naw, they just brought that guy around because he must have saw us somewhere near the filling station.' David Brown said, 'Now, I remember where he could have been, remember when we left the station, you said you wanted to go to a rest-room and we stopped at the Avon or Savon station, well, that white-haired guy must have been around there.' Montgomery said, 'Well, Dave, just keep your mouth shut and you won't have nothing to worry about. Now, here's the way we will work it.' Montgomery stated, 'You remember that guy named Earl.' David Brown stated, 'No, I can't place the guy.' Montgomery stated, 'You remember him, he has a lot of hair and wears it down front just like you and same size and everything. Now I'll tell them he was with me at the filling station and I'll take the blame for everything, both robberies and also the stolen truck.' David Brown said, 'How are you going to tell them you hot-wired the truck, you don't know anything about hot wiring and when that D.A. gets you on the stand, he'll trip you up. Now let me tell you how it's done. You take a hot wire put it in back of the coil or switch.' Montgomery stated, 'Yes, sure, we will get to that later, the main thing is that one of us gets out of here, because you are more good to me on the outside than in here, even if I get twenty years for it. Now do like I said and I'll take all the weight.' David Brown says, 'Suppose something goes wrong?' Montgomery said, 'Well, I'll tell them the detectives hit me in the mouth and keep on my back until I had to tell, and I'll tell them I didn't mean to shoot him or I was drinking, but you tell you were at your aunt's house and I'll tell them Earl was with me at the filling station on North Point Road, because they will try me in a Dundalk Court.' David Brown stated, 'No, man,

for something like that, you have to go to a place called Towson and you better hope you don't go before a judge named Turnbull. Man, he's rough.' By this time, there were about eighteen other male prisoners in the whole cell block. While this conversation was taking place, they couldn't, all of them, they couldn't hear what was going on. They were talking real loud."

Appellant contends that Elliott's testimony was admitted in error. He argues that the conversation overheard by Elliott was not "voluntarily made" because Brown was not aware of "the eavesdropping policeman." Thus he invokes his right under the Fifth Amendment not to be compelled in any criminal case to be a witness against himself. There have been sharply different views within the Supreme Court as to the ultimate reach of the Fifth Amendment right against compulsory self-incrimination. "But", as the Court observed in *Hoffa v. United States,* 385 U. S. 293, at 303-304, "since at least as long ago as 1807, when Chief Justice Marshall first gave attention to the matter in the trial of Aaron Burr,[4] all have agreed that a necessary element of compulsory self-incrimination is some kind of compulsion." Here it is clear that the incriminating statements were not the product of any sort of coercion, legal or factual, physical or psychological. The conversations of Brown and Montgomery were wholly voluntary. Nothing said by either was prompted, inspired or solicited by Elliott nor was it caused by or the result of any questioning of either by the officer. On the contrary the evidence is that he never even spoke to them. They simply talked without threat, promise or inducement on the part of the authorities in such circumstances that what they said could be overheard. Elliott, in a position to overhear, was under no obligation to close his ears. As the Court said in *Hoffa, supra,* at 303, quoting with approval the words of the dissenting opinion in *Lopez v. United States,* 373 U. S. 427, at 465:

---

4. *United States v. Burr* (In re Willie), 25 Fed. Cas. 38, (No. 14,692e) (C. C. D. Va. 1807).

> "The risk of being overheard by an eaves-
> dropper or betrayed by an informer or deceived
> as to the identity of one with whom one deals is
> probably inherent in the conditions of human so-
> ciety. It is the kind of risk we necessarily as-
> sume whenever we speak."

We hold that the receipt of Elliott's testimony with re-
gard to the conversations of Brown and Montgomery did
not violate the Fifth Amendment right against self-in-
crimination. See *Jefferson v. State,* 228 Md. 331.

Appellant does not specifically claim a violation of the
Fourth Amendment and we do not think that Amend-
ment was violated. Although the Fourth Amendment can
be violated by guileful as well as by forcible intrusions,
*Gouled v. United States,* 255 U. S. 298, what it protects
is "the security a man relies upon when he places him-
self or his property within a constitutionally protected
area, be it his home or his office, his hotel room or his
automobile. There he is protected from unwarranted gov-
ernmental intrusion." *Hoffa, supra,* at 301.[5] While the
protections of the Fourth Amendment are not limited to
tangibles, but can extend as well in certain circumstances,
to oral statements, see *Silverman v. United States,* 365
U. S. 505,[6] they were not violated here because there was
no unconstitutional intrusion by Elliott into the area.
Even if the cell into which Brown and Montgomery went
to converse be considered a constitutionally protected
area, Elliott did not intrude therein physically and there
was no electronic bugging. Nor was he in any sense a
trespasser by his position in the tier aisle when he over-
heard the conversations. The Supreme Court said in
*Hoffa,* at 302: "Neither this Court nor any member of it
has ever expressed the view that the Fourth Amendment

---

5. The Court noted: "We do not deal here with the law of arrest
under the Fourth Amendment."

6. The Supreme Court made clear in *Morales v. New York,* 90
S. Ct. 291, that it has not yet determined the question of the legal-
ity *vel non* of custodial questioning on less than probable cause for
a full-fledged arrest.

protects a wrongdoer's misplaced belief that a person to whom he voluntarily confides his wrongdoing will not reveal it." Certainly then, it cannot protect the wrongdoer voluntarily confiding his wrongdoing in such a manner that he can be overheard by a third person legally in a position to overhear. See also *Lewis v. United States,* 385 U. S. 206.

Appellant does not contend that the actions of the authorities violated due process of law. However, we call attention to *People v. Lopez,* 384 P. 2d 16 (S. Ct. Cal., 1963) in which it was held that there was no violation of due process in the absence of coercion, invasion of privacy and inducement, in placing a certain prisoner, formerly known to the defendant, and the defendant in the same cell, and permitting such prisoner to testify as to his conversations with the defendant. The court observed, at 30: "Except only insofar as concerns consultation with his attorney in a room designated for that purpose, a prisoner has no right of privacy in a jail. (People v. Morgan (1961) 197 Cal. App. 2d 90, 93 [3], 16 Cal. Rptr. 838, cert. den. 370 U. S. 965, 82 S. Ct. 1606, 8 L. Ed. 2d 830.)" See *Stewart v. State,* 1 Md. App. 309; *Smith v. State,* 1 Md. App. 297; *McClelland v. State,* 4 Md. App. 18.

We find that Elliott's actions did not violate any constitutional rights of appellant. We hold that the lower court did not err in permitting Elliott to testify as to the conversations between appellant and Montgomery.

## V

Appellant claims error in the refusal of the lower court to grant his request for eight instructions. We find no error; the requested instructions were either fairly covered in the instructions actually given or did not correctly state the law applicable on the facts. Maryland Rule 756 b.

> (1) *Bruton v. United States,* 391 U. S. 123 did not preclude the admission of the conversa-

tions between Montgomery and appellant. Statements made in the conversations here were not the product of interrogation by the authorities; the statements held inadmissible in *Bruton* were obtained by custodial interrogation.

(2) There was evidence of premeditation in the murder. The statements that the victim was shot during the robbery after he jumped at Montgomery would tend to show premeditation, as would the loading of the gun before the robbery.

(3) There being evidence of premeditation the jury were not restricted in finding murder in the first degree to a determination that it was committed in the perpetration of a robbery.

(4) The general rule is that an extrajudicial statement of an accused does not warrant a conviction unless there is also independent evidence to establish the *corpus delicti*. This independent evidence need not establish, by itself, the truth of the *corpus delicti* beyond a reasonable doubt or by a preponderance of proof, but any facts and circumstances that are substantial in nature and fortify the truth of the statement are sufficient to support a conviction. *Koprivich v. State*, 1 Md. App. 147, 153-154. Such facts and circumstances here were that the victim was found near a safe from which money had been stolen, dead of a gunshot wound in the head with no weapon present. A request that the jury be instructed that "the law of Maryland requires more evidence than the mere admission of an accused in order to sustain a conviction" neither correctly stated the applicable law nor was it appropriate on the facts.

476

(5) That the jury could not convict appellant of murder in the first degree if they found that the only evidence tending to establish a robbery was by way of the alleged statements of appellant was not proper in the light of evidence from which the jury could find that the murder was premeditated.

(6) The court correctly instructed the jury as to burden of proof and cautioned them to consider all the evidence and accept and act on that part they believed to be true and reject and not act on that part they believed to be untrue. If a statement of an accused is properly admissible it may be weighed by the jury as any other evidence. It was not error to refuse an instruction that "the law requires out-of-court admissions alleged to have been made by an accused * * * to be weighed with great care due to their inherent lack of trustworthiness." We do not construe *Thomas v. State*, 186 Md. 446 to compel the giving of such a charge.

(7) and (8) These requested instructions concerned the rule as to denial or repudiation by an accused of statements made by another person in his presence. Here appellant did not stand mute or deny statements made by Montgomery but rather made inculpatory statements of his own in substantial agreement. The instructions sought were not proper on the evidence. In any event had appellant simply stood mute in the face of Montgomery's statements concerning the crime the rule set out in *Ewell v. State*, 228 Md. 615 would be applicable to permit his conduct to be received as an admission he believed the statements to be true. Neither the qualification of the rule as discussed in *Barnes v. State*, 1 Md. 123 nor the holdings

in *Miranda v. Arizona,* 384 U. S. 436 would control as here the statements were not made by any questioning initiated by a law enforcement official.

## VI

Appellant contends that the evidence was not sufficient to sustain the conviction. Upon the findings of the Medical Examiner and evidence adduced by the testimony of the manager of the filling station, Winship, Randall, Johnson and Elliott the jury could find beyond a reasonable doubt that Greene was murdered, that the murder was in the first degree, either as wilful, deliberate and premeditated, Code, Art. 27, § 407 or as committed in the perpetration of a robbery, § 410, and that appellant was a principal in its commission. We hold that the lower court did not err in denying the motion for judgment of acquittal. See *Williams v. State,* 5 Md. App. 450.

*Judgment affirmed.*