665 A.2d 264

**In re LAKEYSHA P.**

**In re DONTANYON T.**

**Nos. 1447, 1531, Sept. Term, 1994.**

Court of Special Appeals of Maryland.

Sept. 28, 1995.

Edwin H. Convey, Assistant Public Defender (Stephen E. Harris, Public Defender, on the brief), Baltimore, for appellant.

Celia Anderson Davis and Timothy J. Paulus, Assistant Attorneys General (J. Joseph Curran, Jr., Attorney General and Stuart O. Simms, State's Attorney for Baltimore City, on the brief), Baltimore, for appellee.

Submitted Before MOYLAN and HARRELL, JJ., and JAMES S. GETTY, Judge (retired), Specially Assigned.

MOYLAN, Judge.

To pinpoint the precise issue before us on this consolidated appeal, it may be helpful to posit a criminal jury composed of twelve law professors. A 21–year–old defendant is before them on a two-count indictment, the first count charging the Theft of an automobile and the second, the Unauthorized Use of that automobile. Undisputed evidence established that the defendant, without the consent of the owner, broke the window of the automobile, "hot wired" the ignition, and drove off, alone. He was apprehended by the police two minutes later, four blocks away. The defendant, with no criminal record, had apparently never spoken to anyone with respect to that or any other automobile. He gave no statement to the police and did not testify. There was no suggestion that the defendant was not both sane and sober. After several hours of deliberation, the jury returned with a question:

> We are unanimously persuaded beyond a reasonable doubt that the defendant unlawfully took the car and specifically intended to deprive the owner of it. As to the duration of that intended deprivation, however, we don't have a clue. We are not persuaded that the defendant intended to deprive the owner of the car *permanently* or *for such a period as to appropriate a portion of its value.* Neither are we persuaded that the defendant intended to deprive the owner of the car only *temporarily.* Given these findings and non-findings, must we acquit the defendant on all charges or may we resolve our doubt by convicting him of the less blameworthy charge? Please advise.

We would advise that hypothetical jury to convict of Unauthorized Use. There is no eye in the hurricane of guilt. In

reaching that conclusion, we are not unmindful of *Henry v. State*, 273 Md. 131, 328 A.2d 293 (1974). We venture to suggest, however, that *Henry v. State* is no longer binding, inviting as we do so the full scrutiny of the Court of Appeals to be brought to bear on a vexing doctrinal problem. It is the problem of the relationship between two crimes that share every element of a common *corpus delicti*, but then differ only as to the levels of blameworthiness of their respective *mentes reae.* We believe that different gradations or degrees of culpability all rise in the same direction, with each level telescoping imperceptibly into the next higher level as fact finders are, one by one, persuaded that the pertinent boundary marker has been passed. We do not believe that related degrees of blameworthiness point in opposite directions, creating the anomaly (if not absurdity) of some intermediate "free zone" where one might be not guilty enough for the greater crime but too guilty for the lesser crime.

We venture to advance this position because of our belief that the whole mode of legal and semantic analysis typified by cases such as *Henry* and our own *McCarson v. State*, 8 Md.App. 20, 257 A.2d 471 (1969) has, in closely analogous situations, been superseded by a more sophisticated and semantically more finely tuned analysis exemplified by the Court of Appeals opinion in *Lightfoot v. State*, 278 Md. 231, 360 A.2d 426 (1976).

### The Cases at Hand

In each of the two juvenile delinquency adjudications in this consolidated appeal, the key issue is exactly the same. It is not at all fact-specific, but is presented to us as an abstract legal question in two appellate briefs that are essentially *verbatim* copies of each other. Consolidation is appropriate.

At an adjudicatory hearing before Judge Martin P. Welch in the Circuit Court for Baltimore City, the appellant Lakeysha P. was found to have committed the delinquent acts of Theft of a Motor Vehicle and the Unauthorized Use of that same Vehicle—counts one and three, respectively, of the juvenile,

multi-count petition filed against her. At the subsequent disposition hearing, Lakeysha was found to be a delinquent child. She was placed on probation for an indefinite period. Judge Welch indicated that he was merging the "lesser" offense of Unauthorized Use into the "greater" offense of Theft. Notwithstanding having merged the finding on the Unauthorized Use count, the judge then dismissed the count.

It was also at an adjudicatory hearing before Judge Welch that the appellant Dontanyon T. was found to have committed the delinquent acts of Theft of a Motor Vehicle and the Unauthorized Use of that same Vehicle. It was at a subsequent disposition hearing before Judge Paul A. Smith that Dontanyon was found to be a delinquent child. He was placed on probation for one year. Judge Smith ordered restitution in the amount of $300 on the Theft count and opined that the Unauthorized Use count had merged into the Theft count.

### The Issue

Both appellants contend that their judgments of delinquency, based on findings that they had committed automobile Thefts, were fatally flawed because such findings were inconsistent with the companion findings that they had been guilty of the Unauthorized Use of the automobiles in question. The argument is that if they only intended to take the cars temporarily, findings they claim to be implicit in the Unauthorized Use convictions, they could not, *ipso facto,* have intended to take the cars permanently (or quasi-permanently), which would preclude Theft convictions. There is a surface appeal to such an argument, but it is fallacious.

The argument, we note, is not a complaint about multiple punishment, and *In re Montrail M.,* 325 Md. 527, 535, 601 A.2d 1102, 1106 (1992) (holding that a failure to merge two counts is not reversible error where only one penalty is imposed) is not apposite. The argument, rather, is that inconsistent verdicts of Theft and Unauthorized Use cannot stand, quite aside from any concern about multiple punishment. Nor is *State v. Anderson,* 320 Md. 17, 30, 575 A.2d

1227, 1233 (1990), apposite (where an apparent inconsistency in verdicts was explained away and shown not to have been an inconsistency at all).

This contention poses squarely the question of whether the crime of Unauthorized Use of an Automobile is logically inconsistent with the Theft (or larceny) of that automobile or is simply a closely related crime with a lesser included *mens rea.*

## What Did the Legislature of 1880 Intend?

The specimen on the dissecting table is the *mens rea* of Unauthorized Use. The crime itself is now codified as MD. ANN.CODE, art. 27, § 349 (1993). The statute creating the crime was ch. 164 of the Acts of 1880. It was a companion provision to the Maryland "horse stealing" statute, which had been on the books since 1744 and which created a special penalty for the common law larceny of horses and other related chattels. As a mere sub-variety of common law Larceny, dealing with certain specific chattels, the crime of horse stealing required proof of an *animus furandi* or intent permanently to deprive the owner of the horse.

The newly created crime of Unauthorized Use was not a crime recognized at the common law and the 1880 statute had, therefore, to spell out all of its required elements. The essential difference between traditional larceny and the newly enacted crime of Unauthorized Use was that the latter did not require proof of an *animus furandi* nor of any other specific intent.

The question before us is whether the Legislature simply eliminated the requirement of a specific intent to deprive the owner of the chattel permanently—a mere dropping of an element—or whether it intended to create a substitute mental element of an affirmative intent to deprive the owner of the use of the chattel *temporarily.* Some latter-day champions of the "temporary" position maintain that the crime requires affirmative proof of an intent to deprive that is: 1) temporary in duration, 2) nothing but temporary, and 3) proved to be

temporary beyond a reasonable doubt. "Temporary" to them is not something that is merely "less than permanent;" it is the very opposite of "permanent." The indecisive thief, therefore, who has not yet decided whether to keep the horse (or the car) either temporarily or permanently would presumably be guilty of nothing. That is the unavoidable logical consequence of making an affirmative element out of an intended temporary deprivation. That, however, cannot be the law.

### *Dealing With Horse Thieves*

As we begin to probe legislative intent, much can be deduced about the legislators' collective purpose in 1880 by looking at the older law that the new Unauthorized Use statute was fashioned to complement. *Wright v. Sas*, 187 Md. 507, 510, 50 A.2d 809 (1947), provides an excellent history of the horse-stealing statute; *see also In re Wallace W.*, 333 Md. 186, 191, 634 A.2d 53, 56 (1993); *Robinson v. State*, 17 Md.App. 451, 456, 302 A.2d 659, 662 (1973). The *Wright* opinion points out how at early English law "horse stealing had been punished more severely than other cases of larceny." 187 Md. at 510, 50 A.2d 809. A series of English statutes in 1547, 1549, and 1589, *see* 1 Edw. 6, ch. 13; 2 & 3 Edw. 6, ch. 33; 31 Eliz., ch. 12, had removed the benefit of clergy from horse thieves, whether they were principals or accessories before or after the fact, thereby making the stealing of a horse a capital offense. The Maryland Colonial Assembly of 1744 replicated the English penalty provision, making it punishable by death to "steal any horse or horses, mare or mares, gelding or geldings, colt or colts." 1744 Md.Laws, ch. 20 § 1. Ch. 20 was entitled "An Act for Punishment of Horse Stealers and Other Offenders." *Id.*

Following American independence, ch. 61 of the Acts of 1799 amended the 1744 statute modestly by eliminating the plural references and proscribing simply the stealing of "any horse, mare, gelding, or colt" [1] and then adding to the list the entries,

---

1. The grandiloquently redundant litany "horse, mare, gelding, or colt" means simply "horse, female horse, castrated horse, or young horse."

"jack,[2] jenny,[3] or mule.[4] " 1799 Md.Laws, ch. 61. By ch. 38, § 6 of the Acts of 1809, Maryland's first attempt to codify its criminal law, the penalty for violating the horse-stealing statute was reduced to one of not less than two nor more than fourteen years in the penitentiary.[5] 1809 Md.Laws, ch. 38 § 6. It also eliminated the unnecessarily particularized references to "jack" and "jenny" and substituted the gender-neutral term "ass." *Id.* That was the "horse stealing" statute, unchanged after 1809, that was on the books in 1880, *see* MD.CODE art. 30, § 68 (1860), when the Legislature chose to supplement it or complement it with an immediately succeeding section in the criminal code.

### *The Birth of Unauthorized Use*

The Unauthorized Use statute was enacted by ch. 164 of the Acts of 1880. The best way to determine what a law means is to see what it says and what it does not say; the most revealing insight into legislative intent is to look at the words the legislators used. There is little need, as many opinions have done, to look at one-sentence characterizations of the 1880 law made seventy or eighty years after the fact, most of them no more than repetitions of an earlier one-sentence

---

2. A "jack" is a male ass or donkey.

3. A "jenny" is a female ass or donkey.

4. A "mule" is the sterile offspring of a female horse and a male ass or donkey.

5. Ironically, as a result of the 1809 statute, horse thieves (and their functional equivalents) were subjected to a maximum sentence of fourteen years in the penitentiary, one year less than the maximum sentence for ordinary larceny. On the other hand, horse thieves were also subjected to a mandatory minimum of "not less than two" years, twice the mandatory minimum for ordinary larceny. The horse-stealing statute, moreover, covered accessories before and after the fact, whereas the ordinary larceny statute covered only accessories before the fact. The "no less than one nor no more than fifteen" year penalty for ordinary larceny, however, was available only after the petit larceny—grand larceny meridian had been crossed. The penalty provisions for "horse stealing," on the other hand, were not dependent on the proof of any dollar values.

characterization, when one can readily look at the 1880 law itself.[6]

As we now do just that, we reiterate that our narrow focus is on the single question of whether the 1880 law merely eliminated the mental element of an intended permanent deprivation or substituted for it the mental element that there be an affirmatively intended temporary deprivation. Post–1880 amendments to the Unauthorized Use statute have, incidentally, not remotely affected the *mens rea* of the crime and it may not be necessary to look beyond the original statute itself. The 1880 law began by routinely reciting the persons covered by it:

> ANY PERSON OR PERSONS, THEIR AIDERS OR ABETTORS, WHO SHALL ...

1880 Md.Laws, ch. 164.

It then went on to set out two almost indistinguishable sets of circumstances in which the unlawful caption and asportation might occur. Sandwiched between them was the list of specific chattels covered by the law. The new crime first listed all of those special chattels then covered by the horse stealing statute, to wit, horses, mares, colts, geldings, mules, and asses, but then added 1) four varieties of other livestock and 2) four varieties of transportative conveyances plus a miscellaneous catch-all phrase.[7] The law expressly specified its coverage of the following chattels:

---

**6.** Law is a discipline ostensibly rooted in an accurate understanding of past legal phenomena. The first rule of the good historian is to look, whenever possible, at primary sources and not at secondary sources.

**7.** In *Jones v. State*, 304 Md. 216, 221–22, 498 A.2d 622, 624–25 (1985), Judge Couch provided insight into why certain special chattels were "singl[ed] out for special treatment":

Each of the chattels (except for motor vehicles and boats) delineated in § 349 today were also delineated in the original legislation over one hundred years ago. It is clear that these chattels were inherently mobile and were doubtless considered to be of great value when added to the statutory scheme. This mobility, coupled with the value of the property and the increased likelihood of damage to person or property should that property be even temporarily appropriated,

... ANY HORSE, MARE, COLT GELDING, MULE, ASS, SHEEP, HOG, OX, OR COW, OR ANY CARRIAGE, WAGON, BUGGY, CART, OR ANY OTHER VEHICLE OR PROPERTY WHATSOEVER ...

*Id.*

The arguably redundant geographic settings for the unlawful taking and carrying away of certain chattels first prohibits those unlawful acts from the premises of another and then prohibits them from any place whatsoever. *See Thomas v. State,* 277 Md. 257, 269, 353 A.2d 240, 248 (1976). The first possible situs of the crime is from premises:

... WHO SHALL ENTER, OR BEING UPON THE PREMISES OF ANY OTHER PERSON, BODY CORPORATE OR POLITIC IN THIS STATE, AND SHALL AGAINST THE WILL AND CONSENT OF SAID PERSON OR PERSONS, BODY CORPORATE OR POLITIC, OR THEIR AGENTS, WILFULLY TAKE AND CARRY AWAY ...

1880 Md.Laws, ch. 164.

The second venue for unlawful caption and asportation (perhaps inadvertently omitting the adverb "wilfully") is from "whatsoever place," a situs presumably broad enough to have embraced the first:

... OR TAKE AND CARRY AWAY OUT OF THE CUSTODY, OR USE OF ANY PERSON OR PERSONS, BODY CORPORATE OR POLITIC, OR THEIR AGENTS, ANY OF THE ABOVE ENUMERATED PROPERTY AT WHATSOEVER PLACE THE SAME BE FOUND ...

*Id.*

At that point in the statute, the crime of Unauthorized Use is completely defined. All of its required elements are expressly set out. As a "junior varsity" version of larceny law

---

resulted in "singling out for special treatment" the chattels found in unauthorized use statutes. (Citation and footnote omitted). *Id.*

generally or of horse-stealing law specifically, the new crime includes all of the elements of the older crimes save one. The express elements are:

1. AN UNLAWFUL TAKING;

2. AN UNLAWFUL CARRYING AWAY;

3. OF CERTAIN DESIGNATED PERSONAL PROPER-TY;

4. OF ANOTHER.

Significantly, the new crime does not mention any specific *mens rea* or particular intent element at all. There is no larcenous *animus furandi;* neither is there any lesser or "junior varsity" version thereof. The specific intent element has simply been eliminated.

The crime having been fully defined, the statute then proceeded to set out the sanctions. A person convicted of the crime, as thus described, was: 1) deemed guilty of a misdemeanor, 2) obligated to restore the property, 3) subject to a fine, and 4) subject to imprisonment. As a crime without the *animus furandi* of the horse-stealing statute, it only carried a prison term of between one and six months [8] rather than a term of between two and fourteen years. The penalty provisions of the 1880 law were:

> ... SHALL, UPON CONVICTION THEREOF IN ANY OF THE COURTS OF THIS STATE HAVING CRIMINAL JURISDICTION, BE ADJUDGED GUILTY OF A MISDEMEANOR, AND SHALL RESTORE THE PROPERTY SO TAKEN AND CARRIED AWAY, AND BE FINED NOT LESS THAN FIVE NOR MORE THAN TWENTY DOLLARS, OR BE IMPRISONED IN THE CITY OR COUNTY JAIL NOT LESS THAN ONE NOR MORE THAN SIX MONTHS, OR BE BOTH FINED

---

8. Ch. 88 of the Acts of 1892 raised the penalty for Unauthorized Use to a fine of not less than $50 nor more than $100 and/or to imprisonment of not less than six months nor more than four years, the penalty level that still prevails today.

AND IMPRISONED AS AFORESAID, IN THE DISCRE-
TION OF THE COURT ...

*Id.* Then following the sanction-related verbal phrases "shall
... be adjudged," "shall restore," "[shall] be fined," and
"[shall] be imprisoned," came the modifying (by way of being
explanatory) clause:

> ... *ALTHOUGH* IT MAY APPEAR FROM THE EVI-
> DENCE THAT *SUCH PERSON* OR PERSONS, THEIR
> AIDERS AND ABETTORS, *TOOK* AND CARRIED
> AWAY *THE PROPERTY,* OR ANY PORTION OF THE
> SAME ENUMERATED IN THIS SECTION, FOR
> THEIR OR HIS PRESENT USE, AND *NOT WITH THE
> INTENT OF APPROPRIATING OR CONVERTING THE
> SAME.*

*Id.* (Emphasis supplied.)

The transparent purpose of that final proviso was to make
explicit what was already implicit, to wit, that the crime of
Unauthorized Use did not include any element of an *animus
furandi.* The modifying clause was not part of the setting out
of the affirmative elements of the offense. It simply con-
firmed that the sanctions may be imposed on a violator even
though the evidence may show that he did not possess an
*animus furandi.* Thus, an intent to deprive temporarily may
be a sufficient condition, but it is not a necessary condition.

Significantly for present purposes, the word "temporary"
never appeared anywhere in the statute. Indeed, neither the
word "temporary" nor the notion of an affirmative intent to
deprive temporarily would appear for another 83 years, and
even then only in passing references in the case law. Later in
this opinion, we shall discuss both the latter-day gloss on the
1880 statute and the common semantic error of subconsciously
transforming a purely negative silence with respect to an
element into an affirmative statement of the opposite of that
element.

By vivid contrast with the silence of 1880, the Legislature
knew full well how to use the word "temporary" or "tempo-
rarily" when it intended to establish such an element. By ch.

1007 of the Acts of 1943, it enacted what was then codified as Art. 66½, § 154 under the subtitle "Operation of Vehicles Upon Highways":

> Any person who drives a vehicle, not his own, without the consent of the owner thereof, and *with intent temporarily to deprive* said owner of his possession of such vehicle, *without intent to steal* the same, is guilty of a misdemeanor.

1943 Md.Laws, ch. 1007 (Emphasis supplied.) That was the traffic-related statute that *Wright* went to great lengths to contrast with the Unauthorized Use statute now before us, holding that the former differed in many significant regards from the latter and did not, therefore, repeal it by implication. *Wright,* 187 Md. at 510–11, 50 A.2d at 810; *see also Thomas v. State,* 277 Md. at 269, 353 A.2d at 248 (1976). Unlike that statute, now codified as MD.CODE ANN., TRANSP. § 14–102(a), the Unauthorized Use statute *never* employed language such as "with intent temporarily to deprive" or "without intent to steal the same." It specified no particular intent requirement.

### *The Legislative Intent of 1880:*

### *The Probable Purpose of the Complementary Statute*

Another insight into the legislative intent of 1880 may be had by looking at the probable reason for the enactment of the Unauthorized Use statute. The discovery of that probable purpose can be found in significant part in the inextricable linkage between the Unauthorized Use statute and the preexisting horse-stealing statute. They were complementary provisions in the various criminal codes from the moment of the birth of the Unauthorized Use statute in 1880, to the moment of the death of the horse-stealing statute in 1978. 1978 Md.Laws, ch. 849 (repealing MD.ANN.CODE Art. 27, § 348). By then, it was designated as a provision dealing with "Larceny—Horses or Vehicles" and merged with the newly enacted Consolidated Theft Statute, MD.ANN.CODE Art. 27, §§ 340–343 (1992).

Horse stealing and Unauthorized Use were, respectively, §§ 164 and 165 of the Code of 1888; §§ 269 and 270 of the

Code of 1904; §§ 326 and 327 of the Code of 1924; §§ 396 and 397 of the Code of 1939; §§ 414 and 415 of the Code of 1951; and finally, §§ 348 and 349 of the Annotated Code of 1957. Indeed, the Acts of 1918 amended both criminal provisions at the same time by adding to their respective lists of covered chattels "motor vehicles as defined in the laws of this State relating to such." [9]  1918 Md.Laws, ch. 422.

The almost perspicuous purpose of the Unauthorized Use statute in 1880 was to alleviate problems of proof caused by the *animus furandi* element in the larceny law.  The penalty for a violation of the law dealing with the larceny of horses, etc. was harsh.  In marginal cases, where judges or juries may have been loathe to subject a defendant to so harsh a penalty, the easiest way to avoid the imposition of such a sanction would have been to confess a failure of persuasion with respect to the *mens rea* of larceny.  It was easy for the State to prove the mere physical elements or *actus reus*—the unlawful taking and carrying away by the defendant of one of the designated chattels.  Proof of intent to deprive permanently, on the other hand, was far more speculative in nature and gave a fact finder, wishing to mitigate, a convenient avenue to mitigation.

Even with *mens rea* mitigated, however, one who unlawfully took the designated chattels was nonetheless deserving of some punishment, regardless of his intent with respect to the duration of the deprivation.  The Unauthorized Use statute plugged that loophole in the law.  It applied, and still applies, to no less than four closely-related situations: 1) where there is a clearly established intent to deprive only temporarily; 2) where there is simply a failure of persuasion as to the intent to deprive permanently; 3) where the culprit has not, at the moment of the taking, yet decided whether the

---

9:  A year after the repeal of the special larceny provision dealing with "Horses or Vehicles," Ch. 552 of the Acts of 1979 further expanded the list of chattels covered by the Unauthorized Use statute by adding to the list "boat, craft, [and] vessel."  *See In re Wallace W.*, 333 Md. 186, 195, 634 A.2d 53, 58 (1993).

intended deprivation is to be permanent or temporary; and 4) where there is no evidence at all as to the duration of the intended deprivation. The solution to all four problems was not to burden the crime of Unauthorized Use with any special *mens rea* with respect to the duration of the intended deprivation. The law, therefore, was deliberately silent on the subject.

In *Robinson v. State,* 17 Md.App. 451, 456, 302 A.2d 659, 662 (1973), we opined as to the purpose of the 1880 legislation:

> The present Unauthorized Use shoot branched off from the parent stem in 1880. *It filled the gap sometimes left by the absence in the unlawful taker of an animus furandi ....* The "Unauthorized Use Statute" is similar to its senior counterpart in all respects except that *there is no element of "an intent permanently to deprive the possessor of the item taken."* (Footnote omitted.)

*Id.* (Emphasis supplied.) *See also Shope v. State,* 18 Md. App. 472, 475–77, 307 A.2d 730, 732–33 (1973).

### *The Legislative Intent of 1880:*

### *1880 Was Not 1943*

One apparent reason why some persons theorize that the Unauthorized Use law contains an affirmative element of an intent to deprive temporarily is because they misperceive that law as an "anti-joyriding" statute. Many of the so-called unauthorized use statutes around the country were products of the 1940's and 1950's and are, indeed, anti-joyriding statutes. As the Automotive Age came into full bloom, joyriding emerged as a significant problem. *See, e.g.,* 3 Francis Wharton, CRIMINAL LAW & PROCEDURE § 363 at 334 (14th ed. 1980), ("[B]y statute in many jurisdictions, the mere unauthorized use of a motor vehicle—sometimes called "joyriding"—has been made a crime"); W. LaFave & A. Scott, 2 SUBSTANTIVE CRIMINAL LAW, § 8.5(b) at 362 (1986), ("A large number of states have singled out the motor vehicle for special treatment, making it a crime (generally called 'joyriding,' a crime somewhat less serious than larceny) to take such a vehicle

with intent to use it and return it."); B. Finberg, Annotation, *Automobiles: Elements of Offense Defined in "Joyriding" Statutes,* 9 A.L.R.3d 633, 640 (1966); *see* MODEL PENAL CODE § 223.9 Comment, 270–71, entitled "Unauthorized Use of Automobiles and Other Vehicles," which states:

> Nearly all states have legislation penalizing unauthorized taking, use, or operation of motor vehicles. These laws are designed to reach temporary dispossession. The typical situation dealt with is the "joyride," *i.e.,* the taking of another's automobile without his permission, not for the purpose of keeping it but merely to drive it briefly. The offense is typically committed by young people, and the car is generally recovered undamaged. Such behavior would not amount to larceny, which, as traditionally defined, requires proof that the actor intended to deprive the owner permanently.

*Id.* (Footnote omitted.)

R. PERKINS & R. BOYCE, CRIMINAL LAW 333–34 (3d ed. 1982), gives perhaps the best summation of the joyriding problem and the law's response thereto:

> The social problem back of this legislation is well known. When the automobile began to appear and was limited to the possession of a few of the more fortunate members of the community, many persons who ordinarily respected the property rights of others, yielded to the temptation to drive one of these new contrivances without the consent of the owner. This became so common that the term "joyrider" was coined to refer to the person who indulged in such unpermitted use of another's car....
>
> It was when "joyriding" was at its height that most of the legislature enactments providing a penalty therefor were passed and the mere prevalence of this type of wilful trespass is sufficient to explain the creation of this statutory crime.

*Id.*

Where the actual words of a particular statute permit, a plausible argument can be made that an anti-joyriding stat-

ute—a product of the 1940's or 1950's dealing exclusively with automobiles—is aimed narrowly at a circumstance in which the intended deprivation of the automobile is unequivocally temporary, when a teenager unlawfully takes someone's automobile on a lark for the clear purpose of riding around only for a few hours or only for the evening before returning it or abandoning it in some public place.

The only Maryland law that is a candidate for inclusion in the "anti-joyriding" category, however, is the law enacted by ch. 1007 of the Acts of 1943 and now codified as § 14–102(a) of the Transportation Article:

> *Driving vehicle without consent of owner.*—A person may not drive any vehicle without the consent of its owner and *with intent to deprive the owner temporarily* of his possession of the vehicle, *even if without intent to steal it.*

MD.CODE ANN., TRANSP. § 14–102(a) (Emphasis supplied.) The maximum penalty for a violation of that statute is a fine of not more than $500 or imprisonment for not more than two months or both. *Id.* § 27–101(c); *Thomas,* 277 Md. at 269, 353 A.2d at 247.

The Maryland Unauthorized Use statute of 1880, now codified as Art. 27, § 349, was, from its birth, a far different creature. *Thomas,* 277 Md. at 270, 353 A.2d at 248; *Wright,* 187 Md. at 513, 50 A.2d at 811. It was on the books before the automobile itself was invented, let alone before the forbidden pleasures of joyriding in automobiles came into vogue. The Maryland law had, indeed, been part of the criminal law for 38 years before the phrase "motor vehicles" was even appended to its lengthy list of endangered chattels.

We are unaware, moreover, of any special social problem in the years immediately proceeding 1880 of persons' going joyriding on another's "horse, mare, colt, gelding, mule, etc." One might, to be sure, unlawfully "borrow" a horse just to ride it, a cow just to milk it, or a sheep just to shear it; it is hard to imagine, however, why one would ever harbor an intent to deprive another temporarily of his hog. Although there is a decidedly revisionist tendency to look on the crime of Unau-

thorized Use as an anti-joyriding law, concerned primarily with motor vehicles, manifestly that was not the world view of the Maryland Legislature in 1880.

### The Weight of Authority:

### A Lesser Included Offense

Even in the context of anti-joyriding statutes—frequently employing such phrases as "taking or using temporarily" and "without intent to steal," which the Maryland Unauthorized Use law does not—the heavy weight of authority of the case law and the academic commentary alike is that even an anti-joyriding statute is a lesser included offense within the greater, inclusive offense of automobile larceny or automobile theft. PERKINS & BOYCE, *supra*, at 334, observes:

> At the present time there is some tendency to reduce the grade of the offense and extend it to include the unauthorized temporary use of any vehicle. *This statutory crime, whether called "larceny" or not, is in effect an "included offense." It has all of the elements of larceny except the intent to steal,* and is limited to a small portion of the general subject matter of larceny.

*Id.* (Footnote omitted.) (Emphasis supplied.)

The Iowa anti-joyriding statute did not go on the books until 1978. Although it explicitly qualifies the unlawful taking with the words "but without the intent to permanently deprive the owner thereof," it goes on to provide that it is nonetheless a lesser included offense of theft. The Iowa Criminal Code provides:

> Any person who shall take possession or control of any railroad vehicle, or any self-propelled vehicle, aircraft, or motor boat, the property of another, without the consent of the owner of such, *but without the intent to permanently deprive the owner thereof,* shall be guilty of an aggravated misdemeanor. *A violation of this section may be proved as*

*a lesser included offense on an indictment or information charging theft.*

IOWA CODE § 714.7 (Emphasis supplied.)

In *State v. Eyle*, 236 Or. 199, 388 P.2d 110 (1963), the Oregon Supreme Court was dealing with what it described as the "offense commonly referred to as 'joy-riding.'" 388 P.2d at 111. The Oregon statute expressly applied to "[e]very person who takes or uses without authority any vehicle *without intent to steal it.*" *Id.* (quoting OR.REV.STAT. § 164.670) (Emphasis supplied.) Following his conviction for joyriding, the appellant there lodged two complaints. He first contended that the State had failed to prove the *mens rea* of his being "without intent to steal." The Oregon court held squarely that, despite its mention in the statute, that negative notion was not an affirmative element of the crime:

> By employing the words "without intent to steal," the legislature meant to clearly distinguish the crime of "joy-riding" from the greater crime of larceny and provide a specific penalty therefor. *The words were not included so as to constitute an additional element for the state to prove.*
>
> .     .     .     .     .
>
> We likewise hold that *the phrase "without intent to steal" is not part of the definition of the crime* of using a vehicle without authority *and need not be proved.*

*Id.* at 111 (Emphasis supplied.)

The appellant's second argument was that he should not have been found guilty of the lesser crime because the evidence established that he actually intended to steal the automobile. The Supreme Court responded that even if he was guilty of a greater offense, that did not relieve him of guilt for the lesser included offense:

> It is next contended that the evidence indicates that the crime committed was larceny rather than "joy-riding" since the defendant did, in fact, intend to steal the automobile. Though this may well be true, defendant cannot complain of the conviction for the lesser offense. *The state may elect to*

*obtain a conviction for the lesser or included offense even though the accused is guilty of the greater offense.*

.    .    .    .    .

It is thus clear that the fact *that the defendant might have been guilty of the greater crime of larceny is no defense* to his conviction.

*Id.* at 111–12 (Emphasis supplied.)

The Oregon Supreme Court's conclusion was clear:

Thus the "joy-riding" statute stands as an "included offense" of larceny, having all the elements of larceny except the intent to steal.

388 P.2d at 111.

In *Stewart v. State,* 187 So.2d 358 (Fla.Dist.Ct.App.1966), the issue was whether the Florida Unauthorized Use law was a lesser included offense within the crime of automobile larceny. Like the Maryland law, the Florida law covered broadly the unlawful taking of any boat, vehicle, horse, ass, mule, ox, or any other draught animal. It explicitly prohibited "[t]aking or *using temporarily* any vehicle or animal of another without authority." *Id.* at 360 (quoting FLA.STAT.ANN. 811.21) (Emphasis supplied.) The statute itself expressly provided, moreover, that "[n]othing in this section shall be construed so as to apply to any case where the taking of the property of another is with intent to steal the same." *Id.*

Notwithstanding that verbiage, the Florida District Court of Appeal held:

The crime declared in the just-quoted statute seems to us to be a lesser included offense within the crime of larceny of automobiles.

*Id.* at 361. It elaborated:

[W]e find no difficulty in reaching the view that the misdemeanor of using a vehicle without the owner's consent *is a lesser included offense* within the crime alleged in the

amended information—the felony of unlawfully taking, stealing, and carrying away a certain motor vehicle.

*Id.* at 362 (Emphasis supplied.)

In *Spencer v. State,* 501 S.W.2d 799 (Tenn.1973), the Supreme Court of Tennessee came to a similar conclusion with respect to unauthorized use being a lesser included offense within larceny:

> Initially, this Court must determine whether "joyriding" is a lesser included offense of larceny. This issue is one of first impression to Tennessee ...

> Section 59–504 [TENN.CODE ANN.], describes the offense commonly referred to as "joyriding." The statute is designed to condemn the acts of a person who takes another's vehicle unlawfully, but without the intent to deprive the owner of its use permanently. However, the taking of a vehicle with the intent to steal or permanently deprive the owner of its use is prohibited, and is larceny. From a careful examination of the elements of both crimes, *it is clear that the only difference in the two is that in "joyriding" there is not the element of intent to steal. Thus, we hold that the "joyriding" statute stands as an included offense of larceny.*

*Id.* at 800 (Citations omitted.) (Emphasis supplied.)

In *State v. Cornish,* 568 P.2d 360 (Utah 1977), the Supreme Court of Utah was dealing with an anti-joyriding statute that expressly provided:

> Any person who drives a vehicle, not his own, without the consent of the owner thereof and *with intent temporarily to deprive* said owner of his possession of such vehicle, *without intent to steal the same* is guilty of a misdemeanor ...

*Id.* at 361. (quoting UTAH CODE ANN. 41–1–109) (Emphasis supplied.)

That was a case where the fact-finding trial judge expressed the view that "under the evidence, he was uncertain of the intent of the defendant." *Id.* at 361. Under the circumstances, the State had failed to prove beyond a reasonable

doubt, if it was required to do so, either 1) that the defendant had the "intent temporarily to deprive" or 2) that he was "without intent to steal." The Utah Supreme Court had no difficulty rejecting the defense contention that these were fatal flaws in the State's case:

> The only fact the state is not required to establish for joy riding, which is required for theft, is the intent to deprive permanently, or for such an extended period of time that a substantial portion of the economic value is lost.
>
> The phrases "intent temporarily to deprive" and "without intent to steal" do not indicate a legislative intention that an element of the crime, which must be established to sustain conviction, is the time element. *The state must establish an intent to deprive, but the negative "without intent to steal" viz., not permanently but temporarily, is not an element for the state to plead and prove.*

*Id.* (Citation omitted.) (Emphasis supplied.) That Court went on to explain the obvious function of such phraseology in an anti-joyriding or unauthorized use statute:

> It is not incumbent upon the prosecution to prove the quantum of the intent, for *the terms "temporarily to deprive" and "without intent to steal" express no more than a legislative intention to distinguish this crime from the greater offense of theft,* which requires proof of an additional element.

568 P.2d at 362 (Citation omitted.) (Emphasis supplied.)

The opinion, moreover, made it clear that a function of a crime with a lesser intent is not only to deal with those situations where a lesser intent is affirmatively proved but also with those situations where there is simply a failure of proof as to the greater intent:

> *If the trier of fact* is convinced there was an unauthorized use of the vehicle, with an intent to deprive the owner, but *is not convinced* beyond a reasonable doubt *the prosecution has sustained its burden to* present and *prove one of the*

*factors set forth; then defendant should be found guilty of the lesser, included offense . . .*

*Id.* (Citation omitted.) (Emphasis supplied.)

In *Brown v. Ohio,* 432 U.S. 161, 97 S.Ct. 2221, 53 L.Ed.2d 187 (1977), the Supreme Court of the United States was dealing with the double jeopardy implications of sequential prosecutions and convictions in the Ohio courts for 1) joyriding in an automobile and 2) the theft of that same automobile. The Supreme Court first accepted the holding of the Ohio Court of Appeals that joyriding is a lesser included offense within automobile theft:

> Every element of the crime of operating a motor vehicle without the consent of the owner is also an element of the crime of auto theft. "The difference between the crime of stealing a motor vehicle, and operating a motor vehicle without the consent of the owner is that conviction for stealing requires proof of an intent on the part of the thief to *permanently* deprive the owner of possession." . . . [T]he crime of operating a motor vehicle without the consent of the owner is a lesser included offense of auto theft.

*Id.,* 432 U.S. at 163–64, 97 S.Ct. at 2224, 53 L.Ed.2d at 193. In then discussing the double jeopardy implications of that holding, the Supreme Court made it clear that joyriding and automobile theft were, for double jeopardy purposes, "the same offense," with theft being the greater and joyriding being the lesser included.

> Applying the *Blockburger* test, we agree with the Ohio Court of Appeals that joyriding and auto theft, as defined by that court, constitute "the same statutory offense" within the meaning of the Double Jeopardy Clause. As is invariably true of a greater and lesser included offense, *the lesser offense—joyriding—requires no proof beyond that which is required for conviction of the greater—auto theft.* The greater offense is therefore by definition the "same" for purposes of double jeopardy as any lesser offense included in it.

432 U.S. at 168, 97 S.Ct. at 2226–27, 53 L.Ed.2d at 195–96 (Citation omitted.) (Emphasis supplied.); *see also United States v. Johnson,* 433 F.2d 1160, 1164 (D.C.Cir.1970); *State v. Shults,* 169 Mont. 33, 544 P.2d 817, 819 (1976); *State v. Blotzer,* 188 Neb. 143, 195 N.W.2d 199, 200 (1972); *Commonwealth v. Nace,* 222 Pa.Super. 329, 295 A.2d 87, 89 (1972). *Contra Sandoval v. People,* 176 Colo. 414, 490 P.2d 1298, 1300 (1971); *State v. Cobb,* 2 Ariz.App. 71, 406 P.2d 421, 426 (1965).

### *The Legislative Intent of 1880:*

#### *Our Reading*

If we were writing on a clean slate, our conclusion would be easy. Only one interpretation of the 1880 statute seems plausible. Based on 1) the explicit and limited elements the 1880 law sets out, 2) its overwhelmingly probable purpose, particularly in view of its close relationship with the horse-stealing statute, 3) its provenance as a broad 19th Century law and not as a 20th Century anti-joyriding measure, 4) the weight of authority around the country in dealing with similarly related crimes, and 5) the inherent logic of coordinating closely-related *mentes reae* into an integrated whole, it is clear to us that the Legislature in 1880 never intended to establish, as an affirmative mental element, a requirement that the intended deprivation be temporary in nature. It simply intended to eliminate the *animus furandi* of an intended permanent deprivation necessary for a larceny conviction.

If we were to conclude that the 1880 law intended to establish 1) one crime (horse stealing or auto theft) requiring proof beyond a reasonable doubt of an intended *permanent* deprivation and 2) a separate crime with a contrary *mens rea* requiring proof beyond a reasonable. doubt of an intended *temporary* deprivation, we would be attributing to that Legislature a design to create an eye in the hurricane of culpability, wherein an unlawful appropriator of horses and automobiles might stand completely unscathed. All sorts of culprits might slip between those very wide cracks. It is our belief that the

Legislature intended for the related crimes cleanly to abut, with no troublesome crevices between.

It follows that, when the Legislature enacted the Unauthorized Use law, it simply eliminated the *animus furandi* of larceny so that it could handle not only one but a number of circumstances in which the *mens rea* of the culprit might somehow be in question: 1) the situation in which it is clearly established that the intended deprivation was only temporary, 2) the situation in which the intended deprivation was probably permanent but where there is a failure to carry the burden of persuasion in that regard, 3) the situation in which the fact finder is actually persuaded that the intended deprivation was still of uncertain and undetermined duration in the mind of the culprit, and 4) the situation in which there was simply no evidence at all bearing on the duration of the intended deprivation.

To reach any other conclusion would require us to attribute to the Legislature of 1880 the absurd scheme of saying to would-be horse thieves, "If you intend to keep the horse a long time, you go to jail; if you intend to keep the horse a short time, you go to jail; but if you truly don't know how long you intend to keep the horse or if we can't figure out how long you intend to keep it, you go free." That would be an inane legislative intent that we cannot ascribe to the lawmakers of the Gilded Age. The intended *temporary* deprivation notion, as an affirmative element, just won't fly.

### The Change, If Any,

### From Larceny to Theft

In assessing the possible inconsistency between companion guilty verdicts, we are, of course, no longer measuring a conviction for Unauthorized Use, under MD.ANN.CODE art. 27, § 349, against a conviction for the Larceny of a Vehicle, under the former § 348. We are now measuring it against a conviction for the Theft of an automobile, under § 342. Does that make any difference to the present analysis? No.

By ch. 849 of the Acts of 1978, the Maryland General Assembly repealed a number of laws dealing with common law larceny, a variety of special larcenies of special chattels, and many other larceny-related offenses. It brought them together as part of a new Consolidated Theft Statute, codified as MD.ANN.CODE art. 27, §§ 340–344. Section 341 of the new law declared that the consolidation was not intended to abolish or to modify any of the preexisting crimes but only to treat them as instances of a single more broadly defined and more efficiently prosecuted crime known as Theft.

Section 342 defined Theft as a crime including, along with other elements, the *mens rea* of having "the purpose of *depriving* the owner of the property." Section 340(c) provided a series of definitions for that term "deprive." The definitions embraced four situations:

"Deprive" means to withhold property of another;

(1) Permanently; or

(2) For such a period as to appropriate a portion of its value; or

(3) With the purpose to restore it only upon payment of reward or other compensation; or

(4) To dispose of the property and use or deal with the property *so as to make it unlikely that the owner will recover it.*

MD.ANN.CODE art. 27, § 340(c) (1991).

As part of a debate that is largely academic over distinctions without differences, some argue that that series of definitions of "deprive" has broadened to some extent what was once the *animus furandi* of larceny. Others argue that the series of definitions is no more than declaratory of the way the case law had broadly applied the larcenous *animus furandi*. In any event, for present purposes, the only member of the series that concerns us is the second definition of "deprive" as "withhold[ing] property of another ... [f]or such a period as to appropriate a portion of its value."

It is clear that that definition of "deprive" does not embrace every unauthorized use of another's property, no matter how minimal or how brief. If that were the case, what is now the crime of Unauthorized Use would be subsumed into the consolidated crime of Theft and § 349 would be repealed by implication. When ch. 849 of the Acts of 1978, however, meticulously listed the preexisting crimes that would be subsumed and the corresponding statutes that would be repealed, § 349, dealing with "Unauthorized use of livestock, boat, or vehicle," was deliberately left untouched.

The critical distinction between it and the larceny-related crimes that were subsumed into consolidated Theft is that it does not possess the special *mens rea* requirement of Larceny. Even if we were to assume that § 340(c)(2) has ratcheted downward the former *animus furandi* of Larceny so as to embrace even less "permanent" intended deprivations, it still possesses more of a *mens rea* requirement than does Unauthorized Use. The utility of § 349's elimination of any special *mens rea* is that it, unlike Larceny or Theft, is available to penalize unlawful captions and asportations when the intended deprivation is less than long enough to appropriate a portion of the value of the property, where the intended deprivation is of an indeterminate quality or duration, and where the intended deprivation is simply unproved. The change from the Larceny of Horses or Vehicles to consolidated Theft has not extinguished the issue we are still called upon to address.

### 83 Years Later:

### Making Something Out of Nothing

Our biggest problem, of course, is that we are not writing on a clean slate. It is not enough, however, simply to read what is on the slate. If we are to be more than automatons, we must determine, if we can, how whatever is on that slate came to be there.

In reference to the 1880 Unauthorized Use statute, the very notion of an intended "temporary" deprivation, as an affirmative element, did not appear until 83 years after the law's

enactment. Then it inexplicably was offered as an uncritical conclusion in a single sentence in *Fletcher v. State*, 231 Md. 190, 193, 189 A.2d 641 (1963) ("It is obvious that the phraseology of this statute does not cover cases involving an intent to deprive an owner of his proper permanently, as in larceny or receiving, *but is designed to embrace only cases involving intent to deprive the owner of his custody or use of such property temporarily,* without intent to steal it.") (Emphasis supplied.) That sentence was unexceptionable in its description of what the Unauthorized Use statute did *not* cover or require.

When it made an assumption as to what the statute *did* require, however, it committed the common semantic fallacy of transforming the purely negative phenomenon of a statute's silence with respect to an element into an affirmative statement of the opposite of that element. There was no analysis and no apparent awareness that there was even a question calling for analysis. It was simply assumed—as a self-evident truism—that anything not required to be *permanent* is thereby automatically required to be *temporary.*

*Fletcher* cited as authority both *Wright v. Sas,* 187 Md. 507, 50 A.2d 809 (1947) and *Anello v. State,* 201 Md. 164, 93 A.2d 71 (1952). Neither case, however, supports that conclusion. *Wright* was no authority at all for the proposition for which it was cited. It was a case wherein a *habeas corpus* petitioner, having been convicted of a § 349 (then § 397) violation, claimed that the conviction was invalid because the 1880 crime had been repealed by implication by the passage of ch. 1007 of the Acts of 1943, the anti-joyriding statute then codified as art. 66½, § 154 (now § 14–102(a) of the Transportation Article).

*Wright* rejected that argument, holding that the 1943 anti-joyriding statute did not preempt the field even with respect to motor vehicles. (It obviously did not preempt the field with respect to any "horse, mare, gelding, colt, mule, etc." in that it did not even purport to cover chattels other than vehicles.) Reserving the possibility that future decisions "might or might not establish other differences between the two offenses,"

*Wright* relied on two such differences. 187 Md. at 514, 50 A.2d at 811. The first was that the 1943 Motor Vehicle statute required the actual "driving" of the vehicle, *id.* at 514, 50 A.2d at 811, whereas the 1880 Unauthorized Use statute could be satisfied by other modalities, *see id.* at 513, 50 A.2d at 811. *Wright* stated that "[o]n the other hand, pushing ... or towing an automobile would be 'take and carry away' under Section 397." *Id.*

The second significant difference is that the 1880 law, by its very terms, requires an actual caption and asportation from present possession, which the 1943 Motor Vehicle law does not. The 1880 Unauthorized Use statute applies expressly to one "who shall ... take and carry away [one of the designated chattels]." It is like common law larceny in that regard and does not embrace other unlawful appropriations that would have constituted embezzlements or larcenies after trust. "[I]t includes elements similar to larceny, *.e.g.,* 'take and carry away.' Even if it includes 'take and carry away out of the custody and use of any persons' other than the owner, it can hardly include unauthorized use by a bailee, *e.g.,* a garage keeper of an automobile already in his 'custody or use.'" 187 Md. at 513, 50 A.2d at 811.

By contrast, the 1943 law does not require that a violator "take or carry away" a vehicle. Its action words are "to drive a vehicle ... with intent temporarily to deprive said owner of his possession." It was with unequivocal reference to the 1943 statute, by way of contrasting it with the 1880 statute, that *Wright* observed:

> In any event "intent ... to deprive [the] owner of his possession" includes future possession and is not limited, like common law larceny, to a taking out of the owner's present possession.

187 Md. at 513, 50 A.2d at 811. *Wright* did not in any way discuss the issue of intended *permanent* deprivation versus intended *temporary* deprivation.

The other case cited as authority by *Fletcher* was *Anello.* It also turns out to be no authority at all for the proposition

for which it was cited.   The only issue in *Anello* was the legal sufficiency of the evidence to support the conviction for the Unauthorized Use of an automobile.   Anello claimed that someone else was the actual thief and that when he (Anello) accepted a ride in the automobile, he had no idea that it was stolen.   The primary thrust of the opinion was that the evidence was sufficient to support a finding that Anello had guilty knowledge from the outset.   The second thrust was that since both Larceny and Unauthorized Use may involve a continuing trespass, one can be guilty of a caption and asportation by joining a trespassory taking already in progress. 201 Md. at 167–68, 93 A.2d at 72–73.

As with *Wright, Anello* was not even considering any question of intended *permanent* deprivation versus intended *temporary* deprivation.[10]   With neither *Wright* nor *Anello* supporting the proposition for which it was cited, there was, thus, no basis whatsoever for *Fletcher*'s creating out of thin air an affirmative element of intended *temporary* deprivation.   Under close examination, *Fletcher* simply vaporizes.

Unlike a chain's dependence on its weakest link, however, a legal error seems to grow in strength with each repetition. Within six years, what began as a mere semantic fallacy acquired a respectable pedigree.   With a citation to *Fletcher,* it appeared as *dicta* one year later in *Ballard v. State,* 236 Md.

---

10.   In another regard, *Anello v. State* should be handled, as authority, with extreme caution.   In discussing the history of the crime of Unauthorized Use, it referred to the holding of *Wright v. Sas* that the 1943 law had not repealed by implication the 1880 statute.   It then stated, inexplicably:

> As we said in that case [*Wright v. Sas* ], intent to deprive the owner of his possession includes future possession and is not limited, as in common-law larceny, to a taking out of present possession.   Therefore, participation in the continued use of the car after the original taking would manifest an intent to deprive the owner of his possession during such participation.

201 Md. at 167–68, 93 A.2d at 72–73.   *Anello* appears to be applying, unwittingly and inappropriately, to the 1880 Unauthorized Use statute the characterization that *Wright v. Sas* was indisputably making about the 1943 Motor Vehicle statute in the course of contrasting it with the 1880 law.

579, 581–82, 204 A.2d 672, 673 (1964). This Court on four occasions, although only in passing *dicta* and once only by way of a footnote, reiterated the false affirmative that the crime of Unauthorized Use requires "an intent to deprive the owner of his property temporarily." *McCarson v. State*, 8 Md.App. 20, 21–22 n. 1, 257 A.2d 471, 472 n. 1 (1969) (a passing observation in a footnote about a merger versus inconsistency issue that had not been raised by the appellant); *Sizemore v. State*, 5 Md.App. 507, 515–16, 248 A.2d 417, 422 (1968) (legal sufficiency of evidence to support conviction for automobile larceny); *Anderson v. State*, 3 Md.App. 85, 88, 237 A.2d 813, 815 (1968), *cert. denied*, 393 U.S. 1106, 89 S.Ct. 912, 21 L.Ed.2d 801 (1969) (dealing with the legal sufficiency of the evidence to support a conviction for automobile larceny); *Gopshes v. State*, 1 Md. App. 396, 398, 230 A.2d 475, 477 (1967) (dealing only with the legal sufficiency of the evidence to support the acceptance of a guilty plea to automobile larceny). On each occasion, the only authority cited was the use of the word "temporary" in a single sentence by *Fletcher*, 231 Md. at 193, 189 A.2d at 644.

With *McCarson*, however, the unsupported semantic fallacy took on a new vitality. The *dicta* in the footnote added a rhetorical flourish that became a highly quotable soundbite: "[i]t is patent that an automobile cannot be taken with the intent both to steal it and not to steal it."[11]   8 Md.App. at 21 n. 1, 257 A.2d at 472 n. 1. With that soundbite, the ground-work was prepared for *Henry v. State*, 273 Md. 131, 328 A.2d 293 (1974).

*Henry*, to be sure, held squarely that a conviction for Unauthorized Use did not merge into a conviction for the Larceny of an Automobile, but was, rather, inconsistent with

---

11.  Despite its surface allure, the posited inconsistency is not necessarily true.  It is easy to say, "It is patent that one cannot intend to take both more and less."  That is not to say, however, that the "more" may not include the "less."  It is easy to say, "It is patent that one may not simultaneously intend both a grand larceny and a petty larceny."  That is not to say, however, that the intended theft of $301 may not include the intended theft of $299.  The soundbite begs the question rather than answers it.

it. The inconsistency was predicated on the *contrary* intents of the two crimes—permanent versus temporary deprivation. *See* 273 Md. at 135, 328 A.2d at 297. The authoritative support for the *Henry* decision was essentially three-fold. *Henry* relied first on *Ballard,* 236 Md. at 581, 204 A.2d at 673, which, in turn, relied primarily on *Fletcher,* 231 Md. at 193, 189 A.2d at 644.

Although there were some other peripheral references in *Ballard,* they do not sustain its conclusion. Two of the three out-of-state opinions cited by *Ballard*—*Eastway v. State,* 189 Wis. 56, 206 N.W. 879 (1926) and *People v. Tellez,* 32 Cal. App.2d 217, 89 P.2d 451 (1939)—compare automobile larceny not with a law such as Maryland's 1880 Unauthorized Use crime but with express "anti-joyriding" statutes. Those statutes prohibited the driving of a motor vehicle on a highway without the consent of the owner, crimes such as the one spelled out by MD.CODE ANN., TRANSP. § 14–102(a). The third out-of-state opinion, *People v. Ramistella,* 306 N.Y. 379, 118 N.E.2d 566 (1954), stands for the unremarkable proposition that one cannot be convicted of violations of both a specific automobile larceny statute and also general common law larceny. *See id.,* 118 N.E.2d at 569. *Ballard's* support dissolves into exclusive reliance on *Fletcher* and the authoritative weight of *Ballard* is, therefore, no greater than the authoritative weight of *Fletcher.*

The second major reliance of *Henry* is on the rhetorical flourish or soundbite from the *dicta* in the *McCarson* footnote. This, as we have discussed, is nothing more than *Fletcher* with a flourish.

A third, and significant, authority relied on by *Henry* was the opinion of the Supreme Court of Colorado in *Sandoval v. People,* 176 Colo. 414, 490 P.2d 1298 (1971). The Colorado Court, to be sure, had held squarely that its anti-joyriding statute included, as an affirmative element, the intent to deprive the owner of the automobile *temporarily. Id.,* 490 P.2d at 1300. The Colorado statute, however, was in stark contrast to Maryland's 1880 Unauthorized Use statute. It

was a statute dealing expressly with "Joyriding" and confined exclusively to automobiles. The Colorado statute, moreover, unlike the 1880 Maryland statute, explicitly spelled out the following intent provisions:

> ... for the purpose of *temporarily depriving the owner* thereof of said automobile, or of the use of the same, or for the purpose of *temporarily appropriating the same* to his own use, or of *temporarily making use of the same* ...

COLO.REV.STAT. § 13–13–2 (1963) (Emphasis supplied.)

*Henry v. State* rests on a tripod of authority. Under scrutiny, each of the three legs of that tripod collapses. What then becomes of *Henry?*

### The Semantic Fallacy
### of the False Affirmative

Because the 1880 statute never used any phrase such as "to deprive temporarily" and never established any special *mens rea* with respect to the duration of any intended deprivation, the natural question arises: "How did such statements as those found in *Fletcher* and in *McCarson* and ultimately in *Henry* ever find their way into the Maryland case law?" It was simply because of the way we use language.

It has been a recurring phenomenon in the history of the criminal law that the classic major crimes sometimes present prosecutorial problems because of a failure of proof (or sometimes even a failure of perpetration) with respect to one or another of their required elements. As part of the continuing growth of the criminal law, legislatures plugged those perceived loopholes by enacting new statutory offenses that, precisely or essentially, tracked the older crimes except that one of the classic elements was eliminated from the definition. The process was one of subtraction. In comparing the newer crime to the older, the salient difference was the purely negative phenomenon that an element had been eliminated.

Language, however, like nature, abhors a vacuum. As commentators, academic and judicial, over the years came to

describe the newer crimes, they fell into the easy linguistic habit of expressing a negative in positive terms. The absence of a familiar element was casually transformed into an affirmative statement of the opposite of that element. The absence of required proof of "nighttime," for instance, became affirmatively described as "daytime." The absence of required proof of a "premeditated" intent to kill became affirmatively described as a "non-premeditated" intent to kill. The absence of required proof that a crime be consummated became affirmatively described, in attempt law, as the "failure to consummate" the crime.

This common linguistic phenomenon is what we here designate as the semantic fallacy of the false affirmative. It was an obvious instance of this particular fallacy when the mere absence of a requirement of an intent "permanently" to deprive was transformed into an affirmative intent "temporarily" to deprive.

As a rough description of one of the newer, lesser crimes, adequate enough for ordinary communication, the use of the false affirmative poses no problem. It is only when the false affirmative is unwittingly elevated to the status of a required element that our thinking goes askew. The antidote should always be to look at the literal provisions of the statute itself rather than at intermediate and sometimes flaccid characterizations of it, but the case law is not always so painstaking.

One of the inevitable problems of miscasting the absence of an element as an affirmative statement of the opposite of that element is that two closely related crimes end up pointing in opposite directions and the point at which one crime should blend gently into the other becomes, instead, a doctrinal "no man's land." With respect to several of these possible applications of the false affirmative, however, Maryland has successfully avoided the semantic snare.

### A. Daytime Housebreaking Does Not Mean "Daytime":

Common law burglary required that the felonious breaking and entering of the dwelling of another occur *in the nighttime.*

To plug an obvious loophole in the criminal law, various statutes were enacted to criminalize even non-nighttime housebreakings. *See Johnson v. State,* 10 Md.App. 652, 658–59, 272 A.2d 422, 425 (1971). Until all of the burglary-related laws were recodified by ch. 712 of the Acts of 1994, art. 27, § 30(b) expressly proscribed "... the crime of breaking a dwelling house *in the daytime* ...". (Emphasis supplied.) The question naturally arose as to whether "daytime" really meant "daytime" or whether it was intended to cover any situation in which there was non-proof of "nighttime" or, indeed, to cover "anytime."

In *St. Clair v. State,* 1 Md.App. 605, 232 A.2d 565 (1967), the defendant challenged the sufficiency of the evidence to prove the "daytime" element of daytime housebreaking because the evidence showed only that the breaking had occurred sometime in the course of a four-day period. The State could not prove either *daytime* or *nighttime.* Notwithstanding the express use of the term "daytime" in the law, this Court held that daytime housebreaking "was not a different offense from common law burglary but was merely a lesser degree of the same offense" and that "when the proof fails to show the time of the offense then the burglar may be punished under the statute providing the lesser penalty." 1 Md.App. at 622, 232 A.2d at 575. "Daytime" was correctly construed to mean "anytime." *Id. See also Gazaille v. State,* 2 Md.App. 462, 464, 235 A.2d 306, 307 (1967) ("Since the time of the housebreaking could not be ascertained, the appellant was charged with and convicted of the lesser included offense—daytime housebreaking as opposed to common-law burglary.")

In *Reagan v. State,* 4 Md.App. 590, 244 A.2d 623 (1968), the defendant challenged the adequacy of his indictment for daytime housebreaking because of its failure to charge that the offense occurred "in the daytime." In rejecting the contention, Judge Orth observed:

We think that the time of the offense, *"in the daytime," is not an essential element of the crime,* and is not used in the statute to define or characterize the offense, but merely to

distinguish it from burglary which must be committed in the nighttime.... *As it is not necessary to prove that the offense occurred in the daytime, it is not necessary to allege that fact.*

4 Md.App. at 595–96, 244 A.2d at 626 (Emphasis supplied.); *see also Williams v. State,* 100 Md.App. 468, 477, 641 A.2d 990, 994 (1994); *Davis v. State,* 68 Md.App. 581, 586–87, 514 A.2d 1229, 1231 (1986), *aff'd in part and rev'd in part on different grounds,* 310 Md. 611, 530 A.2d 1223 (1987) ("The 'daytime' aspect of § 30(b) is not used to define or characterize the crime, but merely to distinguish it from burglary."); *Reagan v. State,* 6 Md.App. 477, 479, 251 A.2d 615, 616 (1969).

Maryland thereby not only handled logically the problem that occurs when there is no proof of exactly when a breaking takes place. It also resolved the dilemma of the "twilight burglar" who strikes precisely when the world hangs in equipoise between night and day, and no one can say beyond a reasonable doubt that it is one and not the other. With respect to housebreaking, Maryland dodged the bullet of the false affirmative.

### B. Wanton Indifference Does Not Mean "Indifference":

Depraved-heart murder, committed with a *mens rea* that is generally described as "wanton indifference or unconcern" with the consequences of one's life-endangering acts, possesses a mental element less purposefully malignant than would be a specific intent to kill or to inflict grievous bodily harm. Proof of *indifference* however, does not contemplate that there must be affirmative evidence of the absence of a more malignant purpose.

In *Robinson v. State,* 307 Md. 738, 517 A.2d 94 (1986), the defendant challenged his conviction for "depraved heart" murder. The defendant had previously, before the victim died, been convicted of an assault with intent to disable that victim. The defendant argued that the earlier conviction had established a deliberate and specific *intent or purpose* to inflict disabling harm and that principles of collateral estoppel,

therefore, precluded relitigating the state of the defendant's mind so as to find the requisite "indifference" to the consequences. *Id.* 307 Md. at 744, 517 A.2d at 97. It could plausibly be argued that one is not indifferent to that which one specifically purposes or intends. Judge Adkins quoted with approval our description, in *DeBettencourt v. State*, 48 Md.App. 522, 530, 428 A.2d 479 (1981), of "depraved heart" murder as something involving "wanton unconcern and indifference as to whether anyone is harmed or not." 307 Md. at 744, 517 A.2d at 97 (quoting 48 Md.App. at 530, 428 A.2d at 484). Judge Adkins then rejected the contention that 1) a desired harmful consequence and 2) an indifference to the consequences are fatally inconsistent or contrary states of mind.

> Robinson seizes upon the last sentence we have just quoted and argues that "depraved heart" murder does not exist if there is a specific intent to harm. *See also Lindsay v. State*, 8 Md.App. 100, 104, 258 A.2d 760, 763 (1969) ("depraved heart" murder exists where, "conceding that there was no actual intent to injure, an act was done or duty omitted wilfully, the natural tendency of which was to cause death or great bodily harm"); R. Perkins, *Criminal Law* at 36 (2d ed. 1969) (". . . even if there is no actual intent to kill or injure"). *But these authorities say no more than that the crime may be committed absent intent to injure. They do not hold that the crime is not committed if there is an intent to injure.*

>      .      .      .      .      .

> The terms "recklessness" or "indifference," often used to define the crime, do not preclude an act of intentional injury.

307 Md. at 745, 517 A.2d at 97–98 (Emphasis supplied.).

Once again, Maryland avoided the semantic trap of the false affirmative. Proof of *indifference* does not imply the affirmative disproof of something worse than indifference.

## C. *Reckless Endangerment Need Not Negate Intended Harm:*

The implications of "wanton disregard or unconcern with the consequences" that *Robinson* dealt with in the context of "depraved heart" murder were addressed by this Court in *Williams v. State,* 100 Md.App. 468, 641 A.2d 990 (1994), in the context of reckless endangerment. The question in *Williams* was whether an assault with intent to maim was inconsistent with the *mens rea* of reckless endangerment. We stated the. problem:

> In one sense of the words, a "disregard" of and an "indifference" to the consequences might seem categorically to preclude or be precluded by a deliberate and purposeful effort to inflict a harmful consequence, just as surely as they might seem categorically to preclude or be precluded by a deliberate and purposeful effort to *avoid* a harmful consequence. A willful and determined malefactor, such as one who assaults with the intent to maim, cannot, it would seem, be lightly dismissed as one who is *merely* disregardful of or indifferent to his own malevolent purpose. The malevolence is arguably more significant than that. One meticulously contriving to bring about a harmful end cannot, in one sense of the word, be characterized as *merely* reckless. Precisely such a conclusion was reached in *People v. Coleman,* 131 Ill.App.3d 76, 86 Ill.Dec. 351, 475 N.E.2d 565 (1985), a case in which the Appellate Court of Illinois held that the inconsistent *mentes reae* precluded convictions for both attempted murder and reckless conduct.

100 Md.App. at 475, 641 A.2d at 993 (Emphasis in original) (Footnote omitted). Our holding nonetheless was clear that proof of a lesser *mens rea* such as that involved in reckless endangerment does not require affirmative disproof of a greater *mens rea.*

> To be guilty of reckless endangerment, the defendant must be shown to have possessed *nothing less than* a reckless disregard of the consequences of his life-threatening act. He may, however, be shown to have possessed a

more blameworthy *mens rea,* such as an intent to maim, but that excess culpability will be simply surplusage as far as the reckless endangerment charge is concerned. It certainly does not operate to exculpate him of the reckless endangerment.

*Id.* at 476–77, 641 A.2d at 994 (Emphasis in original). As one *mens rea* escalates almost imperceptibly into another, what is involved is not an inconsistency between the two mental states but a merger of one into the other:

[T]he proof of disregard or indifference necessary for reckless endangerment does not require disproof that a particular consequence was specifically intended or affirmatively desired. *A finding of disregard or indifference may imply nothing more than the failure of proof of specific intent.* Concern for a specifically intended consequence does not belie an unconcern for such a consequence but, all other conditions for merger being satisfied, simply subsumes it.

100 Md.App. at 478, 641 A.2d at 994–95 (Emphasis supplied.)

Again, Maryland avoided the semantic siren call of the false affirmative.

### D.  The General Linguistic Problem:

In rejecting in *Williams* the contention that the *mentes reae* there before us were inconsistent, we analyzed generally the linguistic problems that may occur when dealing with an escalating *mens rea:*

As we move up the continuum of escalating blameworthiness from negligence to gross negligence to recklessness to specific intent and beyond, at each level our descriptive concentration is on the last enhancing or incremental element that may bring us up to that level. The definitional focus at each step is on the additional element that may *raise* the level of blameworthiness to that level, not on what will hold it down to that level. Because the progression is upward, we employ language, in our statute law and in our case law, so as to contrast the level of blameworthiness in issue with those levels below it, not with those above it.

When, therefore, we describe the *mens rea* of reckless endangerment in terms such as "the wanton disregard of life-threatening consequences," what the law means is that *nothing less than* that *mens rea* will suffice. It does not mean that *neither less than nor more than* that *mens rea* will suffice. We are describing the minimum content for a finding of guilt in a particular degree, not the maximum content.

100 Md.App. at 475–76, 641 A.2d at 993 (Emphasis in original.)

■ Thus, it is always a defense to prove that one is less culpable than charged. It is never, however, a defense to prove that one is more culpable than charged. It is no defense to second-degree murder to prove that the killing was premeditated. It is no defense to involuntary manslaughter to prove that the killing was voluntary. The State is never called upon to disprove the greater guilt. Proof of guilt moves upward, not downward. Where there is doubt as to the appropriate level of guilt, the defendant receives the benefit of the doubt and is convicted only at the lower level, but a defendant is never entitled to total exculpation because there is ambiguity as to the level of guilt.

### *Exposing the Semantic Fallacy:*

### *Lightfoot v. State*

■ In one significant area of the criminal law, by way of contrast, Maryland failed to dodge the semantic bullet. With the original Pleas of the Crown, the early common law punished only consummated crimes. By the late 15th Century, however, the Court of Star Chamber recognized the necessity to punish the inchoate crime of a criminal attempt. Since that time, one is guilty of the crime of attempt if one harbors a specific intent to commit a crime and then takes a significant step toward its consummation. A simple *mens rea* and a simple *actus reus.*

In the minds and pens of academic commentators and jurists alike, however, it did not take long for the semantic fallacy of the false affirmative to insinuate its way into the

general description and layman's definition of attempt. Because its overarching utility was to proscribe criminal behavior that fell short of consummation, it was inevitable that an attempt would be conceived of by many as a crime that occurred only when there was *a failure of consummation.* The mere absence of the element of consummation was semantically transmuted into the opposite of that element.

*Wiley v. State,* 237 Md. 560, 207 A.2d 478 (1965), with the support of reputable academic authorities, defined the crime of attempt:

> An attempt to commit a crime consists of an intent to commit it, the performance of some act towards its commission, *and failure to consummate its commission.* 22 C.J.S. *Criminal Law* Sec. 75(1), p. 228, and Hochheimer, *Crimes and Criminal Procedure* (2d Ed.), See, 266, p. 297.

237 Md. at 563–64, 207 A.2d at 480. (Emphasis supplied.) *Franczkowski v. State,* 239 Md. 126, 210 A.2d 504 (1965), repeated the definition of "attempt" from *Wiley:*

> The elements of attempt to obtain money by a false pretense, like other attempts to commit a crime, are an intent to commit it, the doing of some act towards its commission, *and the failure to consummate its commission. Wiley v. State,* 237 Md. 560, 207 A.2d 478 (1965).

239 Md. at 127, 210 A.2d at 505 (Emphasis supplied.)

Early decisions of this Court contributed to the growing pedigree of the definitional error. *Boone v. State,* 2 Md.App. 80, 233 A.2d 476 (1967), was unequivocal:

> *A failure to consummate the crime is as much an essential element of an attempt as the intent and the performance of an overt act* towards its commission. Evidence that a crime has been committed will not sustain a verdict on an attempt to commit it because the essential element of interception or prevention of execution is lacking. *Consummation of the crime can take the behavior out of the definition of an "attempt."* See Clark & Marshall, *Law on Crimes, supra,* Sec. 4.14, citing *People v. Lardner,* 300 Ill.

264, 267, 133 N.E. 375, 19 A.L.R. 721 (1921), where a conviction for an "attempt to commit larceny" was reversed upon facts which showed the consummation of the larceny.

2 Md.App. at 114, 233 A.2d at 495 (Emphasis supplied.)

In *Tender v. State,* 2 Md.App. 692, 237 A.2d 65 (1968), *cert. denied,* 393 U.S. 1096, 89 S.Ct. 885, 21 L.Ed.2d 787 (1969), it was held that convictions for the consummated crime and the attempt to commit it were inconsistent:

This Court follows the rule that *the failure to consummate the commission of an offense is a necessary ingredient in an attempt* to commit that offense. Having been convicted of committing robbery with a deadly weapon, the appellants cannot be found to have failed to commit it, which is a necessary ingredient in the proof of the attempt.

2 Md.App. at 698, 237 A.2d at 69 (Citations omitted) (Emphasis supplied); *see also Price v. State,* 3 Md.App. 155, 159, 238 A.2d 275, 277 (1968) ("Having been convicted of committing robbery with a deadly weapon, the appellants cannot be found to have failed to have commit it, which is a necessary ingredient in the proof of attempt"); *Reed v. State,* 7 Md.App. 200, 203, 253 A.2d 774, 776 (1969) ("An attempt to commit a crime consists of an intention to commit it, the performance of some act towards its commission and the failure to consummate the offense"); *Wiggins v. State,* 8 Md.App. 598, 604, 261 A.2d 503, 507 (1970) ("An attempt to commit a crime is an act done in pursuance of a criminal intent falling short of the actual commission of the crime").

In *McDuffie v. State,* 12 Md.App. 264, 278 A.2d 307 (1971), the pedigree continued to grow:

In *Boone v. State,* 2 Md.App. 80, 114–115 [233 A.2d 476], this Court took the position that a necessary element in the crime of attempt is the failure to consummate the greater crime which was being aimed at. *See also Tender v. State,* 2 Md.App. 692, 698–699 [237 A.2d 65]; *Price v. State,* 3 Md.App. 155, 159–160 [238 A.2d 275]. Under the holding of those cases, *a conviction for attempt would be inconsistent with a conviction for the consummated crime.*

12 Md.App. at 266–67, 278 A.2d at 308 (Emphasis supplied); *see also Maloney v. State,* 17 Md.App. 609, 636, 304 A.2d 260, 275 (1973) ("[An attempt] consists of an act, done in pursuance of criminal intent falling short of the actual commission of the crime").

That proposition of law—that the failure to consummate was an affirmative element of the crime of attempt—had thus acquired by 1975 a substantial pedigree, consisting of nine Maryland opinions (two from the Court of Appeals and seven from this Court) and supported by such respected academic authorities as Lewis Hochheimer on *Criminal Law,* Clark and Marshall on *Crimes,* and *Corpus Juris Secundum.* Notwithstanding that growing body of precedent, the Court of Appeals in *Lightfoot v. State,* 278 Md. 231, 360 A.2d 426 (1976), as well as this Court in *Lightfoot v. State,* 25 Md.App. 148, 334 A.2d 152 (1975), did not hesitate to order a radical correction of course when more sophisticated analysis revealed that the earlier position, no matter how oft repeated, had been wrong. It was that dramatic correction of course that emboldens us to take our present action. *See* 278 Md. at 237–38, 360 A.2d at 429–30; 25 Md.App. at 161–62, 334 A.2d at 159–60.

The factual situation in *Lightfoot* was neither marginal nor ambiguous and the question before the Court of Appeals was squarely posed:

The question here is whether a criminal defendant may properly be convicted of *attempted* armed robbery upon evidence clearly establishing a consummated armed robbery.

278 Md. at 231, 360 A.2d at 426 (Emphasis supplied.) If the failure to consummate were, indeed, an affirmative element, a requirement that had been espoused by Maryland for ten years, the impact on the conviction in the *Lightfoot* case would have been clear:

It is often stated that failure to consummate the crime is one of the essential elements of a criminal attempt. *If this be so, it logically follows that if the uncontradicted evidence establishes the consummated crime, there can be no convic-*

*tion for attempt,* and the courts of several states have so concluded.

278 Md. at 233–34, 360 A.2d at 427 (Footnote omitted.) (Emphasis supplied.)

█ Judge Eldridge quoted with approval both *State v. Fox,* 159 N.W.2d 492 (Iowa 1968) and *Crump v. State,* 259 Ind. 358, 287 N.E.2d 342 (1972), as Iowa and Indiana explained why a conviction for attempt is subsumed within a conviction for a consummated crime and is not in any sense inconsistent with it. 278 Md. at 234–35, 360 A.2d at 428. In *Fox,* the Supreme Court of Iowa had stated:

> [A]s the greater includes the less, it is manifest that in every case where an attempt is charged proof of the actual commission of the offense establishes the attempt. *If the offender actually commits the offense, he necessarily attempted to do it,* and proof of the commission of the actual offense does not constitute a variance.

159 N.W.2d at 495 (Emphasis supplied.) In *Crump,* the Indiana Supreme Court had similarly observed:

> It should make no difference whether the criminal conduct is successful or unsuccessful when determining an included offense. The conduct is the same in both cases; the actor's intent is the same in both cases.

287 N.E.2d at 345. The self-evident fact that the crime of attempt lacks one required element (commission of the offense) possessed by the consummated crime does not imply, as a false affirmative, the opposite of the subtracted element (the *non-commission* of the offense).

By parity of reasoning, when the 1880 Legislature failed to impose upon the new crime of Unauthorized Use any larceny-like mental requirement of an intent to deprive *permanently,* it did not thereby create, *sub silentio,* an opposite mental requirement of an intent to deprive *temporarily.*

We have also been advancing in this opinion the proposition that an accused may not successfully defend against a criminal prosecution by proving that he was actually more guilty than

charged. We have been urging that such a defense would be not only misbegotten, but absurd. We again find support in *Lightfoot*, as the Court of Appeals there quoted with approval *United States v. Fleming*, 215 A.2d 839 (D.C.App.1966), 278 Md. at 235, 360 A.2d at 428, wherein the District of Columbia Court criticized such a defense as one creating

> the anomalous situation of a defendant going free "not because he was innocent, but for the very strange reason, that he was too guilty."

278 Md. at 235, 360 A.2d at 428 (quoting *Fleming*, 215 A.2d at 840–41). Indeed, the District of Columbia Court of Appeals referred to such a possible result as a "logical absurdity." 215 A.2d at 839.

Again, by parity of reasoning, one would not defend against an allegation of an intended *lesser* deprivation (even if such a mental requirement existed) by proving an intended *greater* deprivation. If there were intents that were *inconsistent*, on the other hand, such a defense would be plausible.

The more penetrating approach taken by *Lightfoot* also relied heavily on, and quoted extensively from, the perceptive analysis of ROLLIN PERKINS, CRIMINAL LAW 552–54 (2d ed. 1969). Professor Perkins posed the dilemma that might occur if the mere absence of an element were to be misconceptualized as the opposite of that element. There would be created the "logical absurdity" referred to by *United States v. Fleming*—the "hurricane's eye" of paradoxical immunity in the midst of unquestioned persuasion of guilt. The Court of Appeals concurred that it would, indeed, be an "absurd result," that might flow from the paradox:

> Suppose in ... a trial the uncontradicted evidence shows beyond doubt that defendant attempted to commit the offense charged, but there is conflict in the testimony as to whether the attempt succeeded or failed. Some of the statements on the subject, if carried to their logical conclusion, would entitle the defendant to an instruction which would tell the jury in substance: (1) they must acquit the defendant of the completed offense unless satisfied beyond a

reasonable doubt that the attempt was successful; (2) they must acquit the defendant of an attempt to commit the offense unless satisfied beyond a reasonable doubt that the attempt failed. In other words *the position would be that defendant is entitled to a verdict of not guilty if there is doubt in regard to success or failure although no doubt that the attempt was made.* There is no proper basis for such a position, and probably no court would carry the unsound notion to such an absurd extreme.

278 Md. at 235–36, 360 A.2d at 428–29 (Emphasis supplied.) (quoting PERKINS at 553–54).

The literal holding of the Court of Appeals in *Lightfoot* was clear:

[F]ailure to consummate the crime is not an indispensable element of criminal attempt. The language in *Franczkowski* and *Wiley* to the contrary is disapproved.

Consequently, where a defendant is charged with both the crime and the attempt to commit it, and where he is acquitted of the crime and convicted of the attempt, the attempt conviction may stand even though the evidence established that the crime was fully consummated.

278 Md. at 238, 360 A.2d at 430.

The teaching of *Lightfoot* at a higher level of abstraction is that when an appellate court is called upon to examine the precise nature of a relationship between two obviously related crimes, it should bring to that task a philosophic long view and sense of historic purpose and not get "hung up" on mere trivial characterizations of the relationship appearing haphazardly in the case law. That is *stare decisis* at a deeper level.

### The Commonality of the Problem

The key to the solution of the problem before us is an appreciation of its commonality with similar problems arising out of the various relationships we have been discussing. Whenever one compares a newer crime to an older and more senior one, the focus is on the difference between them.

When that difference is that the junior crime lacks a key element of the senior, there inevitably emerges in the shadows of the mind the hidden trap of the false affirmative. Subconsciously, we conflate non-proof of nighttime with *proof* of non-nighttime, non-proof of malice with *proof* of non-malice, non-proof of consummation with *proof* of non-consummation, and non-proof of permanent intent with *proof* of non-permanent intent. These are not mere isolated and self-contained legal-semantic phenomena. They are instances of a common problem calling for a common and consistent solution.

### Conclusion

Just as a consummated crime and an attempted crime do not, per *Lightfoot,* point in different directions, the Theft of an automobile and the 1880 crime of Unauthorized Use similarly do not point in opposite directions. In neither relationship does there lurk that unintended "eye" in the hurricane of guilt.

To avoid multiple punishment, the conviction for Unauthorized Use, as a lesser included offense, merged into the conviction for automobile Theft in the case of each appellant. In neither case was there a fatal inconsistency between the two convictions.

### Evidentiary Sufficiency

The appellant Dontanyon T. alone raises the additional contention that the evidence was not legally sufficient to support the verdict of Theft of the automobile. He claims that the evidence did not adequately establish the linkage between the white Chevrolet Blazer in which Dontanyon was apprehended, the tag number of which enabled the arresting officer to determine that it was a "stolen car," and Deborah Samms's 1991 Chevrolet, described in the indictment. The claim is disingenuous.

Prior to the testimony of the only State's witness, Officer Sean White, who made the "collar," the undisputed peripheral facts were disposed of by a brief and casual oral stipulation:

Ms. Olin: [T]here is a stipulation as to ownership and the amount of the deductible, which is $300.

The Court: Well, give me first [what] the stipulation as to ownership would be?

Ms. Olin: The ownership would be [that] the victim, Deborah Samms, owns a 1991 Chevrolet, tag number, Maryland tag 151688M.

Although in a court trial it is not literally necessary, of course, to move for a judgment of acquittal in order to preserve for appellate review the issue of evidentiary insufficiency, tacit acquiescence at significant junctures may nonetheless help to resolve arguable ambiguities. Dontanyon T. never contested the issue of the ownership of the vehicle in which he was apprehended, either by a motion for dismissal or in closing argument at the adjudicatory stage. If the stipulation as to the ownership of the "stolen car" in which he was found was arguably vague, Judge Welch was not alerted to seek further clarification, which could easily have been supplied within 60 seconds. Nor was any such contention raised at the disposition hearing at which Dontanyon readily consented to pay $300 in restitution to Ms. Samms.

Under the circumstances, the fact-finding trial judge could reasonably have inferred that "the" vehicle referred to in the stipulation as to its ownership was, indeed, "the" vehicle in which Dontanyon was riding at the time of his arrest. Any other reading would reduce the proceedings to an Abbott and Costello "routine." The verdict was not clearly erroneous.

*JUDGMENTS AFFIRMED; COSTS TO BE PAID BY APPELLANTS IN EQUAL AMOUNT.*